IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Docket No. 15-1874

------------------------------------

ELVIS SOTO-MUNIZ,

Plaintiff-Appellant,

-against-

ALLAN MARTIN; JOHN DOES #1-5, (said names being fictitious, as the true
names are presently unknown), individually and in their official capacities;
CORIZON, INC., FKA Correctional Medical Services, Inc.; DAVID MEEKER;
DR. LIONEL ANICETTE; YASSER SOLIMAN,

Defendants-Appellees.

------------------------------------

APPEAL FROM MARCH 10, 2015 ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY,
ROBERT B. KUGLER, J., NO. 1:10-CV-3617(RBK), GRANTING
SUMMARY JUDGMENT TO DEFENDANTS

BRIEF FOR PLAINTIFF-APPELLANT

SCOTT A. KORENBAUM, ESQ.
11 Park Place, Suite 914
New York, New York 10007
(212) 587-0018

STEPHEN BERGSTEIN, ESQ.
BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, NY 10918
(845) 469-1277

Attorneys for Plaintiff-Appellant

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Plaintiff's Medical Treatment at CRAF. . . . . . . . . . . . . . . . . . . . . . 3

    C.    Plaintiff's Medical Treatment at SWSP. . . . . . . . . . . . . . . . . . . . . . 4

    D.    Dr. Martin Examines Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.    Plaintiff is Discharged into General Population. . . . . . . . . . . . . . . . 7

    F.    Plaintiff's Health Continues to Deteriorate. . . . . . . . . . . . . . . . . . . . 9

    G.    Plaintiff is Sent to the Hospital for Surgery
          to Remove his Colon and Rectum. . . . . . . . . . . . . . . . . . . . . . . . . . 10

    H.    Plaintiff's Expert Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

THE DECISION BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

BECAUSE DR. MARTIN IGNORED PLAINTIFF'S
WORSENING CONDITION, FAILED TO INSURE THAT
HE RECEIVE ADEQUATE HYDRATION THROUGH THE
USE OF AN IV, AND DID NOT SEEK OUTSIDE
INTERVENTION UNTIL IT WAS TOO LATE, A JURY MAY
REASONABLY CONCLUDE THAT HE WAS
DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS
MEDICAL NEEDS, WHICH RESULTED IN THE REMOVAL
OF HIS COLIN AND RECTUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.      Legal Standards Governing Deliberate Indifference
        to Serious Medical Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.      The Jury May Find that Dr. Martin was Deliberately
        Indifferent to Plaintiff's Serious Medical Needs . . . . . . . . . . . . . . 25

        1.      Dr. Martin Failed to Provide the Necessary
                Treatment for Plaintiff's Ulcerative Colitis,
                Worsening Dehydration, and Rapid Weight
                Loss, and Instead Repeatedly Discharged him
                from the Infirmary and Returned him to
                the General Prison Population . . . . . . . . . . . . . . . . . . . . . . . . 26

        2.      Dr. Martin was Deliberatively Indifferent by
                Failing to Make a Sufficient Effort to Obtain
                an Urgently Necessary Gastrointestinal
                Consult for Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        3.      The District Court Resolved Disputed Factual
                Issues in Granting Summary Judgment . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# TABLE OF AUTHORITIES

Cases:                                                                    Page(s)

*Alcoa, Inc. v. United States*
   509 F.3d 173 (3d Cir. 2007) ..................................... 23

*Andrews v. Camden Cty.*
   95 F. Supp. 2d 217 (D. N.J. 2000) ............................... 24

*Farmer v. Brennan*
   511 U.S. 825 (1994) ............................................ 24

*J.M.K. v. Luzerne County Juvenile Detention Ctr.*
   372 F.3d 572 (3d. Cir. 2004) ................................ 21, 25

*Johnston v. Corr. Med. Servs.*
   No. 05-5235, 2008 U.S. Dist. LEXIS 105127
   (D.N.J. Dec. 23, 2008) ................................. 25-26, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) ............................................ 23

*Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*
   834 F.2d 326 (3d Cir. 1987) ................................... 25

*Natale v. Camden Cty. Corr. Facility*
   318 F.3d 575 (3d Cir. 2003) ................................... 25

*Regents of Mercerburg College v. Republican Franklin Ins. Co.*
   458 F.3d 159 (3d Cir. 2006) ................................... 23

*Rouse v. Plantier*
   182 F.3d 192 (3d Cir. 1999) .................. 21, 22, 24, 25, 29, 30, 31

*White v. Napoleon*
   897 F.2d 103 (3d Cir. 1990) ........................... 24, 25, 30, 36

Statutes and Other Authority:

28 U.S.C. § 1291 .................................................... 1

42 U.S.C. § 1983 .................................................. 1, 3

Fed. R. Civ. P. 56(a) ............................................... 23

## JURISDICTION

Pursuant to 42 U.S.C. § 1983, plaintiff-appellant Elvis Soto-Muniz filed this action on April 30, 2010, in the Eastern District of New York. (JA 104). The case was transferred to the District of New Jersey on July 15, 2010. (JA 33, Dkt. Entry 10). As the Complaint raised a federal question, the district court had subject matter jurisdiction.

On March 10, 2015, the district court granted defendant's motion for summary judgment, dismissing the Complaint in its entirety. (JA 2). This Court therefore has appellate jurisdiction under 28 U.S.C. § 1291. Appellant timely filed a notice of appeal on April 7, 2015. (JA 1).

## STATEMENT OF THE CASE

Plaintiff-appellant Elvis Soto-Muniz ("plaintiff" or "Soto-Muniz") was an inmate at the Central Reception and Assignment Facility in Trenton, New Jersey, and at South Woods State Prison in Bridgeton, New Jersey. (JA 120, ¶ 7). During his incarceration, plaintiff received medical treatment for his ulcerative colitis, an inflammatory bowel disease. Over time, his condition worsened, without relief from defendant-appellee Allan Martin, M.D. ("Dr. Martin"). In the end, plaintiff was transferred to a hospital, where his rectum and colon were removed. As relevant to this appeal, Soto-Muniz sued Dr. Martin for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (JA 118, *et*

*seq*.). Soto-Muniz argued that the deliberate indifference resulted in the removal

of these organs. On March 10, 2015, District Judge Robert B. Kugler granted Dr.

Martin's motion for summary judgment. (JA 3-28). Plaintiff appeals from that

ruling.

## QUESTION PRESENTED

Whether the court below erred in granting the motion for summary

judgment of Dr. Martin with respect to plaintiff's claim that Dr. Martin was

deliberately indifferent to his serious medical needs in violation of the Eighth

Amendment, where a jury can reasonably conclude that Dr. Martin knew that

Soto-Muniz suffered from acute ulcerative colitis, failed to provide him with vital

IV fluids, observed his worsening dehydrating and rapid weight loss, and

repeatedly discharged him from the infirmary and returned him to the general

prison population instead of insuring he receive prompt and necessary surgical

intervention?

## STATEMENT OF FACTS

A. Background.

Plaintiff suffered from ulcerative colitis, an inflammatory bowel disease.

The parties agree that "[i]f [ulcerative colitis] symptoms cannot be controlled, a

surgical removal of the colon and rectum may be required." (JA 53, ¶ 9).

In May 2008, plaintiff was treated at Bergen Regional Medical Center ("BRMC") in connection with his condition. Plaintiff responded well to this treatment. On May 16, 2008, plaintiff was sentenced in a criminal matter and held at the Bergen County Jail. (JA 54 ¶ 11). On July 10, 2008, plaintiff was transferred to the custody of the New Jersey State Department of Corrections ("NJDOC") and sent to the Central Reception and Assignment Facility ("CRAF"). (JA 54, 58).

B. Plaintiff's Medical Treatment at CRAF.

On July 10, 2008, plaintiff was seen at CRAF Nursing Intake by Giselle Williams, LPN. Nurse Williams noted on the medical record that plaintiff had been hospitalized two months earlier, and had a history of hepatitis C and ulcerative colitis. (JA 58, ¶ 25). That day, plaintiff was also seen at Physician Intake by Sharon Levin, RN, NP, who noted plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding. Levin placed plaintiff on Sulfasalazine 500 mg, three times per day, and Prilosec 20 mg daily. (JA 58, ¶ 26).

On July 15, 2008, plaintiff was seen at Sick Call with Phyllis Hewins, RN, complaining that his "meds [were] not working for ulcerative colitis," that he also had nausea for three days, and he was not able to eat. Plaintiff was also in pain, with cramping and a "small amount of loose BM." For his pain, plaintiff was

given Acetaminophen 325 mg, two tablets two to three times daily. (JA 59, ¶ 28).

The next day, feeling lightheaded, plaintiff was seen at Sick Call. (*Id.* at ¶ 29). Plaintiff told Dr. Grace Melendez that he had ulcerative colitis for the past seven years and that he had been hospitalized eight times since September 2007. In her notes, Dr. Melendez recorded that plaintiff's illness was chronic, and that he needed IV hydration, prednisone, and a gastrointestinal consult. She also noted that plaintiff had been accepted for transfer to the infirmary at South Woods State Prison ("SWSP"). (JA 59, ¶ 29).

C. Plaintiff's Medical Treatment at SWSP.

On July 17, 2008, plaintiff was transferred to SWSP, where he was seen by Jennifer Kuty, RN. (JA 59, ¶ 30). Plaintiff told Nurse Kuty that he had no appetite, and had been "bleeding rectally for a month." Nurse Kuty noted plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding, and that he was taking Sulfasalazine 500 mg, three times per day, Prilosec 20 mg, daily, and Acetaminophen 325 mg, two tablets two to three times per day. (*Id.* at ¶ 30). Lisa Renee Mills, RN, also noted an order upon plaintiff's admission to the infirmary to "push oral fluids," and for administration of IV fluids for dehydration. (JA 60, ¶ 31).

That day, plaintiff told Gail Willett, RN, that he felt nauseous "on and off."

-4-

(JA 60, ¶ 32). Plaintiff also said he had a seven-year history of ulcerative colitis, diabetes mellitus, and a history of rectal bleeding, including "intermittent" rectal bleeding during the prior month. Plaintiff was "pale in color" and "slightly dehydrated." He said he had abdominal pain due to his colitis. Willett tried to start an IV for administration of fluids "but due to extensive heroin use of veins" she was "unable to start line after [six] attempts." Plaintiff was instead given oral fluids and encouraged to drink fluids. (JA 60, ¶ 32).

On July 18, 2008, plaintiff was seen in Infirmary Rounds by nurses Linda Bigay, James R. Welch, Clevelyn Ricalde and Stephanie Kulda. (JA 60-61, ¶¶ 33-37). Bigay had attempted without success to insert a heparin lock, and had instructed plaintiff to continue drinking copious amounts of fluids until the next nurse came to insert a "Hep-lock." (JA 60, ¶ 33). Plaintiff also saw James R. Welch, RN, who noted that plaintiff had complained about diarrhea. (*Id.* at ¶ 34). Medical records at this time also noted that plaintiff had abdominal pain and diarrhea "with blood." (JA 61-62, ¶¶ 36, 39, 41). The records also provided that Soto-Muniz had complained about weakness and anorexia. (JA 61, ¶¶ 37-38).

D. Dr. Martin Examines Plaintiff.

Plaintiff saw Dr. Martin for the first time on July 18, 2008. Dr. Martin noted Soto-Muniz's complaints of diarrhea, abdominal pain and melena, with a

-5-

history of ulcerative colitis. He further noted that plaintiff was "chronically ill appearing." (JA 61, ¶ 35). After Dr. Martin saw plaintiff, Nurse Ricalde noted that plaintiff was alert and "oriented x3," with regular respirations, but that he had complained of abdominal pain and diarrhea. (*Id.* at ¶ 36). When Stephanie Smith, RN, saw plaintiff, she noted he was alert and "oriented x3," but that he had not eaten breakfast due to his abdominal pain. (*Id.* at ¶ 37). Plaintiff appeared chronically ill and pale. (JA 69, ¶ 71).

As part of his GI examination of plaintiff on July 18, Dr. Martin noted tenderness in the abdomen. Other than the tenderness in the lower abdomen, the exam was normal. (*Id.*) Plaintiff was started on further treatment for his symptoms, including additional anti-inflammatory medication and stronger pain medication. (*Id.* at ¶¶ 70, 73). Plaintiff was given Prednisone along with Prilosec, and Vicodin instead of acetaminophen. (*Id.* at ¶ 70). Dr. Martin testified that, since "there was no way to get an IV" in plaintiff's veins, Soto-Muniz would need to continue "hydration by mouth." (*Id.* at ¶ 73). According to Dr. Martin, the only form of available IV hydration in light of plaintiff's condition was with a subclavian line, which could only be done in a hospital setting. However, since plaintiff was taking hydration orally, Dr. Martin determined that an IV was not necessary. (JA 70, ¶ 75). Since plaintiff was not throwing up, medical staff would

continue to encourage as much oral liquid and supplemental intake as possible. (JA 69-70, ¶¶ 73-75).  Dr. Martin requested a GI consult that day.  (JA 69, ¶ 72).

Dr. Martin again saw plaintiff on July 21, 2008, noting complaints of fatigue and malaise, with diarrhea, abdominal pain, and melena.  Plaintiff's complaints of abdominal pain were "mostly in the lower abdomen," and his "number of stools [had] decreased since 3 days [prior]," though he did report that his stools were bloody.  Despite plaintiff's condition, Dr. Martin  discharged him to general population.  (JA 63, ¶ 44).

Also on July 21, 2008, Dr. Martin requested a GI consult, noting that "[plaintiff] has [a history of] ulcerative colitis, that has been refractory to several medical treatments.  He states that he has been on asacol, remicade, and prednisone at various times [without] success.  He has cont[inued] to have abd[ominal] pain and rectal bleeding. [Please] evaluate.  (JA 63, ¶ 46.)  The GI consult was scheduled to take place on August 13, 2008.  (JA 64, ¶ 46).

E. Plaintiff is Discharged into General Population.

As noted, on July 21, 2008, Dr. Martin discharged plaintiff to the general population, with instructions to "go to med line to get his medications," and to "report to medical for any symptoms."  (JA 63, ¶ 45).  However, plaintiff's health did not improve.  On July 25, 2008, plaintiff was seen at Sick Call by Mary Ellen

Green, RN, who noted that plaintiff complained of nausea, blood in his stools, poor appetite, and weakness.  (JA 64, ¶ 49).  Nurse Fran Green saw plaintiff on August 1, noting that he complained of nausea, abdominal pain, melena, hematochezia, loss of appetite and weight loss.  Nurse Fran Green noted as the plan: "Admit to infirmary for IVF and steroid therapy."  She also noted that lab testing had been ordered and obtained on July 30, and that a GI consult was pending.  (JA 65, ¶ 51).  At the time, plaintiff weighed 133 pounds, *id.*, six fewer pounds than a few days earlier.  (JA 63, ¶ 43).  Plaintiff was transferred to the Infirmary.  (JA 65, ¶ 51).

After plaintiff arrived at the Infirmary, Dr. Martin saw him later that afternoon.  Dr. Martin noted that plaintiff complained of anorexia, weight loss, abdominal pain, and hematochezia.  Plaintiff was "chronically ill appearing."  At the time, Dr. Martin noted that the GI consult was scheduled for August 13, 2008.  (*Id.* at ¶ 53).  Because Dr. Martin did not find "anything acute going on that warranted him to be in [the Infirmary]," and noted that Soto-Muniz's weight was stable and his blood pressure was good, he discharged plaintiff to general population.  (JA 74, ¶ 94).  A stool occult blood test was also ordered and obtained on August 1, and on August 5, the results of that test, which were "negative," were received and charted by Avynne Hester, PA-C.  (JA 66, ¶ 55).

-8-

F. Plaintiff's Health Continues to Deteriorate.

On August 4, 2008, Plaintiff submitted a Health Services Request Form,
stating that he wanted to check on the lab testing results, and that he "lost 27 lbs.
and [could] no longer walk or control [his] bowel movement." (JA 65, ¶ 54). He
requested "antibiotics, steroids and fluids intravenously to control my colitis
problem." (JA 65-66, ¶ 54).

On August 5, 2008, Nurse Mary Ellen Green saw plaintiff at Sick Call.
Plaintiff complained of anorexia, fatigue, malaise, and weight loss. The nurse
noted that "[plaintiff] persists in having loose bloody stools and is up most [nights]
in [the bathroom] and not able to sleep." Plaintiff now weighed 130 pounds. The
nurse noted that his "[c]olor [was] sallow and [his] face drawn in appearance with
dark circles and sunken eyes." She gave plaintiff a wheelchair, and wrote that he
needed a lower floor and bunk due to his "present weakness and malaise." (JA 66,
¶ 56). Plaintiff's medications were also noted as Sulfasalazine 500 mg, three times
daily, Prilosec 20 mg, daily, Prednisone 20 mg, two tablets daily, Twocal HN
Liquid, one can three times daily, and Hydrocodone-Acetaminophen 5-500 mg,
two tablets three times daily. On August 5, 2008, a nurse also ordered an
"increased fluid intake" and "bottom floor, bottom bunk, and [wheelchair]" for
plaintiff. (*Id.* at ¶ 57.)

G. Plaintiff is Sent to the Hospital for Surgery to Remove his Colon and Rectum.

Plaintiff was seen by a nurse on the morning of August 6, 2008, in an "Office Visit — Follow Up." At that time, the nurse noted that plaintiff weighed 132 pounds, his blood pressure was 110/80, and he had a pulse of 100 beats per minute. Plaintiff complained of anorexia, fatigue, malaise, and weight loss, and appeared thin and malnourished, with "generalized weakness." He further complained of nausea, diarrhea, abdominal pain, and blood in his stool. (JA 67, ¶ 58). After she examined plaintiff, the nurse reviewed her evaluation and assessment with Dr. Martin. Following that consultation, the nurse noted in plaintiff's EMR, "send to [St. Francis Medical Center] via state van for follow-up [treatment]." (*Id.* at ¶ 59).

Shortly after arriving at SFMC, Plaintiff underwent a surgery to remove his colon. A few months after that, plaintiff underwent a second surgery to remove his rectum. (JA 85, ¶¶ 131-33; JA 98-99, ¶ 204).

H. Plaintiff's Expert Witness.

In opposition to the summary judgment motion, plaintiff relied on the expert medical opinion of Brian G. Turner, M.D. (JA 1126-1162). Dr. Turner stated that plaintiff's care was "not only delayed, but also inadequate based on the severity of his known disease (established based on prior records reviewed by the treating

-10-

individuals in this case)." (JA 1129, ¶ 11).  Dr. Turner summarized his findings as follows:

> The early administration of medical services in the case of acutely ill individuals often dictates the ultimate outcome. Early and upfront management of problems such as dehydration and severe anemia (present in this case) can greatly alter an individual's course and outcome.  Appropriate initial management can alter outcome.  We know from prior established visits the plaintiff responded to conservative medical treatment without the need for consideration of surgery.
>
> The plaintiff's care was not only delayed, but also inadequate based on the severity of his known disease (established based on prior records reviewed by the treating individuals in this case).  The treating individuals were aware of a severe risk to the plaintiff's medical condition based on prior medical record review, yet they failed to take the necessary steps to mitigate risk to the plaintiff.  They recognized the need to place an intravenous line and check labs; however when the treating individuals could not perform what they knew was appropriate, they did not seek and insist on higher level of care for the patient in a medical center. Moreover, a consultant gastroenterologist's opinion was never obtained on how to treat his underlying severe disease, but the treating providers recognized the need for this in their notes.

(JA 1129-30, ¶¶ 10-11).

Dr. Turner identified the following issues with plaintiff's treatment: (1) the failure to treat his dehydration with intravenous fluid ("IVF") and an IV; (2)

-11-

improper medication; (3) no GI consultation was performed; (4) no acknowledgment by medical staff of plaintiff's medical signs indicating severe dehydration; (5) multiple delays in care and (6) severe exacerbation of ulcerative colitis due to poor care, necessitating surgical intervention. (JA 1130-31, ¶ 13). Thoroughly reviewing the chronology of plaintiff's treatment, Dr. Turner stated as follows:

On July 12, 2008, plaintiff requested a medical evaluation, stating he was unable to tolerate an oral diet for three days and was only consuming liquids. (JA 1131, ¶ 14). Three days later, the nurse completed the health services request, noting dehydration. Plaintiff also said the medications were not working and the nausea had persisted for three days. (*Id.* at ¶ 15). On July 16, 2008, Dr. Melendez said plaintiff needed "IV hydration," a "GI consult" and "prednisone." (JA 1131-32, ¶ 16). Meanwhile, plaintiff's high pulse rate manifested as early as July 15, 2008, and "it was determined based on the physician's examination and findings that the patient was suffering from an acute exacerbation of his inflammatory bowel disease." The physician plan further indicated plaintiff "'needs IV hydration' and 'GI consult' and 'prednisone.'" Plaintiff's transfer at SWSP took place on July 17, 2008, "about 5 days after the initial sick call form was placed for review by medical staff." (JA 1131-32, ¶ 16). Dr. Turner concluded:

-12-

> This delay represents a substantial delay in treating a
> patient with such a clear degree of dehydration and
> exacerbation of underlying ulcerative colitis. It is
> general medical knowledge of treating physicians,
> nurses, and nurse practitioners that the reported vital
> signs above represent dehydration and immediate action
> must be taken. The healthcare providers failed to treat
> Mr. Soto-Muniz appropriately, despite vital signs that
> indicate severe dehydration.

(JA 1132, ¶ 16).

On July 17, 2008, plaintiff said he had been bleeding rectally for about one

month and had no appetite. He also tasted blood in his mouth and said "his heart

starts to race and he gets frequent chest pain." His eyes were also hurting.

According to Dr. Turner, "These statements indicated the severity of dehydration

and disease. Additionally, eye pain can be experienced in individuals with

inflammatory bowel disease due to developing autoimmune disorder of the eye.

The comment by Mr. Soto-Muniz that his heart is racing again implies tachycardia

and dehydration." (JA 1132-33, ¶ 17).

The next day, plaintiff's blood pressure was 94/68. Dr. Turner wrote, "This

blood pressure is now even lower and without proper IV fluid hydration the

kidneys risk compromise and low blood flow to other organs, including the colon,

can result in damage. It is within the expected knowledge and scope of a

healthcare provider to understand and recognize that severe dehydration from fluid

-13-

(diarrhea) and blood loss (rectal bleeding) can result in damage to organs such as the kidneys and colon." (JA 1133, ¶ 18).

When Dr. Martin saw plaintiff on July 18, 2008, plaintiff complained of diarrhea, blood in his stool and abdominal pain. He also reported frequent stools and there was abdominal tenderness. He was given hydrocone and oral prednisone to take due to continued lack of IV access. (JA 1134, ¶ 18). However, Dr. Turner noted,

> The patient's health was clearly deteriorating in the early morning, but it was not until many hours later he underwent assessment by a physician to receive recommendations. Unfortunately, there was still no IV access to facilitate the administration of IV steroids (prednisone) or hydrating fluids. These two elements are critical to the treatment of Mr. Soto-Muniz's ulcerative colitis and dehydration. The treating provider is aware of this fact, and noted it on prior requests in the chart for the patient to receive these treatments.

(JA 1134, ¶ 18).

While Dr. Martin defended his failure to provide IV steroids by pointing to plaintiff's drug use, which he claimed prevented the use of IV steroids, Dr. Turner noted that "[t]here are alternative sites of IV access in the body that we use as healthcare providers in the case of challenging anticubital space. Some need to be performed in a hospital facility and in this case a practitioner should refer the

-14-

patient to a facility with such capability."  (JA 1158, ¶ 2).  In other words, the

"patient cannot be blamed for his poor veins and the healthcare providers need to

figure out how to overcome this obstacle.  These types of challenges (in terms of

getting IV access) can be present even in individuals with no history of IV drug

use.  Dr. Evans even states that 'optimal hydration (per IV)' was not given. This

statement underscores that even the defense expert admits that the appropriate

level of care would have been to acquire IV access and it was not done.  (JA

1168).

On July 19, 2008, plaintiff complained about abdominal pain, and a nurse

that evening noted his vitals were remarkable and he had a pulse of 117 and was

bounding.  According to Dr. Turner,

> This tachycardia again demonstrates a marked degree of
> dehydration. The report emphasized "weakness and
> anorexia."  There is no question that prior to this point,
> the patient should have been hospitalized.  A pulse of
> 117 is significantly above normal and continues to
> indicate worsening dehydration.  Any treating provider
> should have recognized that without intravenous access,
> the patient was not going to improve and need inpatient
> admission to a medical facility.  Furthermore, given the
> long term bleeding, the providers should have considered
> he would be severely anemic (low blood count) and this
> would contribute to dehydration and worsening of his
> ulcerative colitis flare. They requested a "CBC" which
> shows they recognized this fact, but did not treat it.

-15-

(JA 1134-35, ¶ 19).

On July 20, 2008, plaintiff still had not received a GI consultation for his complex colitis history and had no IV access to provide adequate fluid hydration. "Given the persistence of tachycardia, the method of oral hydration is clearly not adequate. He is also weak from poor oral intake for at least a week at this period in time." (JA 1135, ¶ 20). The next day, plaintiff was still three days away from another visit from the doctor. (*Id.* at ¶ 21). The medical records show that, although one had been requested, no GI consultation had been obtained. Meanwhile, Dr. Martin reported that plaintiff "[c]omplains of diarrhea, abdominal pain, melena" and "[complains of] lower abd[omen] pain that is colicky in nature mostly in the [lower] abd[omen] and today has some pain [when he] has a [bowel movement." Dr. Martin also reported that "s[o]me of the stools are like 'jelly'. All the stools per the [inmate] are bloody." (JA 1135, ¶ 21). Instead of insisting upon an immediate GI consult, Dr. Martin then inexplicably returned Soto-Muniz to general population, which represented a failure by Dr. Martin "to appropriately treat the patient for dehydration. Even without a GI consult, a medical doctor would recognize the degree of dehydration and have admitted the patient to an inpatient facility for further management." (JA 1135-36, ¶ 21).

While plaintiff told Dr. Martin on July 21, 2008, that he was "feeling

better," that same day Dr. Martin reported that plaintiff complained about diarrhea, abdominal pain, melena, lower abdomen pain and painful bowel movements with stools like jelly. He also noted that plaintiff "complains of fatigue, malaise" and poor appetite. Dr. Turner wrote, "[t]his medical documentation does not describe an individual who has recovered well enough to return to the general population." Also, at this time, "there is no indication he had orthostatic vitals taken, which would have helped the staff recognize the acuity of the illness and dehydration." (JA 1154-55, ¶ 1). Plaintiff was also experiencing weight loss at this time, and "the staff recognized the importance of ordering labs and a GI consult even on this day." (*Id.*) Yet, that consult was never completed. "Equally concerning is his discharge back to the general population." (*Id.*)

Plaintiff remained in the general population for another two days with continued rectal bleeding. When he made a sick call on July 25, 2008, a nurse found that plaintiff had "a bounding radial pulse of 106 and blood pressure of 108/70. His vital signs again indicate severe dehydration. Mr. Soto-Muniz complained of persistent rectal bleeding and nausea. He reported that the stools were frequent, with associated poor appetite and weakness." (JA 1136, ¶ 23). Dr. Turner wrote, "He was (1) not admitted to the infirmary at this time, (2) no laboratory work was completed, and (3) he did not undergo a physical evaluation

-17-

by a nurse practitioner or physician. He made his complaint clear on Friday afternoon, but no further care was contemplated until Monday. Per the records, Mary Ellen Green was advised by F. Green, NP to order labs for Monday and to await GI consultation." (JA 1136-37, ¶ 23).

Continuing his critique, Dr. Turner wrote that, by July 30, 2008, plaintiff "is receiving oral steroids (when he should be receiving IV steroids) and liquid nutritional supplements which are not sufficient to hydrate him in the setting of severe active colitis. He should have been transferred to a facility capable of placing an IV or even central venous catheter (since a peripheral IV could not be obtained) to administer appropriate therapy." (JA 1137, ¶ 24; JA 1155, ¶ 2 ("there is significant belief among gastroenterologists and literature that supports the use of IV steroids when oral therapy is not stabilizing the disease.")).

Dr. Turner also found that "[n]o further documentation of his medical course is presented in the documents reviewed until an emergent visit at St. Francis Medical Center. He was complaining at that time of upper abdominal pain of 8 out of 10 and an approximate 18lb weight loss, with bloody stools, nausea, and vomiting. His vital signs demonstrate tachycardia and indicate again severe dehydration." (JA 1137-38, ¶ 25). In all, Dr. Turner concluded, plaintiff "went close to 4 weeks without IV fluid hydration or IV medications (steroids) to treat

-18-

his underlying disease. The intravenous treatment modality of steroids and fluid

hydration is essential and critical for the recovery of patients with ulcerative

colitis. The lack of appropriate care and the subsequent delays in care resulted in

surgical intervention due to the presence of fulminant colitis." (JA 1138, ¶ 26).

He added, "While a percentage of patients with ulcerative colitis will go on to

have surgeries, the majority can keep their colon with proper intervention and

treatment at the early signs of a flare or relapse. Unfortunately, despite his

repeated efforts to obtain proper treatment, Mr. Soto-Muniz did not receive

appropriate initial care and therefore his chances of successful recovery were

greatly diminished." (JA 1162).

In response to defendants' experts who noted that plaintiff at times had

normal vital signs, Dr. Turner stated, "The medical team failed to take into account

the complete clinical picture of the patient. While vital signs may have appeared to

be normal in some instances, the patient continued to lose significant weight and

profusely bleed from the rectum due to uncontrolled ulcerative colitis on the oral

medications he was given." (JA 1156, ¶ 4). Also, while defendants' expert denied

that plaintiff's care was delayed on "multiple occasions,"

> I would like to refer all parties to my original expert
> opinion (#23) which illustrates how Mr. Soto-Muniz
> reached out again and again for care and discusses how

-19-

his bloody stools persisted. His vitals indicated
dehydration again and at this point he was not even
evaluated by a nurse practitioner or physician. Medical
documents were previously entered into the record
outlining the regimen to which he had responded in the
past. Despite this knowledge, Mr. Soto-Muniz was not
sent for higher level care at a hospital facility. His labs
resulted with a very low blood count, but there is no
documentation that this was acknowledged. Mr.
Soto-Muniz clearly reported to the healthcare facility and
sought their help on at least 3 occasions, and it is 4 if the
blood draw is counted. Due to the inadequate records,
his treatment course is not outlined for several days. I
think it is fair to say that Mr. Soto-Muniz sought help on
multiple occasions and his care was delayed.

(JA 1157, ¶ 5).

## THE DECISION BELOW

At the close of discovery, defendants moved for summary judgment. In its

ruling on the motion, the district court noted that plaintiff had voluntarily

withdrawn all claims other than his § 1983 claim for cruel and unusual punishment

against Dr. Martin. (JA 18). On March 10, 2015, the district court granted

defendants' motions for summary judgment in their entirety. After noting that

"[t]he parties do not dispute that Plaintiff's ulcerative colitis was a serious medical

need" (JA 21), the district court concluded that "[i]t is undisputed that Plaintiff

received some form of treatment while at SWSP. Any dispute concerning the

adequacy of Plaintiff's treatment sounds in negligence, as Plaintiff has failed to

-20-

adduce any evidence tending to show Martin's subjective indifference in making treatment decisions concerning Plaintiff's care." (JA 24).

## SUMMARY OF ARGUMENT

In granting summary judgment, the trial court recognized "that Plaintiff's ulcerative colitis was a serious medical need." (JA 21). The court below concluded, however, that plaintiff's claim failed because "[i]t is undisputed that Plaintiff received some form of treatment while at SWSP. Any dispute concerning the adequacy of Plaintiff's treatment sounds in negligence, as Plaintiff has failed to adduce any evidence tending to show Martin's subjective indifference in making treatment decisions concerning Plaintiff's care." (JA 24). In reaching this conclusion, the trial court failed to draw all reasonable inferences in Soto-Muniz's favor.

A jury may find deliberate indifference to serious medical needs when the prison official "persists in a particular course of treatment 'in the face of resultant pain and risk of permanent injury.'" *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). This Court has recognized that "[w]hether or not a defendant's conduct amounts to deliberate indifference has been described as a classic issue for the fact finder." *J.M.K. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 588 (3d. Cir. 2004) (citations omitted).

-21-

Here, Dr. Martin knew that plaintiff suffered from acute ulcerative colitis,

observed him suffering from worsening dehydration and rapid weight loss, but

failed to insure that he obtain required surgical intervention, including IV

hydration. Moreover, although treating providers, including nurses at SWSP (and

CRAF), noted in the medical records the need to obtain the opinion of a

gastroenterologist ("GI consult") for Soto-Muniz's acute ulcerative colitis, Dr.

Martin failed for weeks to obtain this for him. This failure resulted in harmful

non-escalation of the level of care; a gastroenterologist would have recognized the

severity of Soto-Muniz's ulcerative colitis and advised that such care be provided

to him. (JA 1129-30, ¶ 11). Dr. Martin's delay in ensuring that plaintiff obtained

the necessary care in the face of Soto-Muniz's worsening condition constituted

deliberate indifference to plaintiff's serious medical needs. In other words, there

was simply no reason for the prolonged delay. *Rouse*, 182 F.3d at 197 ("We have

found 'deliberate indifference,' ... including where the prison official ... delays

necessary medical treatment based on a non-medical reason").

## ARGUMENT

BECAUSE DR. MARTIN IGNORED PLAINTIFF'S
WORSENING CONDITION, FAILED TO INSURE
THAT HE RECEIVE ADEQUATE HYDRATION
THROUGH THE USE OF AN IV, AND DID NOT
SEEK OUTSIDE INTERVENTION UNTIL IT WAS
TOO LATE, A JURY MAY REASONABLY
CONCLUDE THAT HE WAS DELIBERATELY
INDIFFERENT TO PLAINTIFF'S SERIOUS
MEDICAL NEEDS, WHICH RESULTED IN THE
REMOVAL OF HIS COLIN AND RECTUM

A. Standard of Review.

This Court reviews the district court's order granting summary judgment de

novo. *Alcoa, Inc. v. United States*, 509 F.3d 173, 175 (3d Cir. 2007). Summary

judgment is appropriate when the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All

ambiguities and inferences must be drawn in plaintiff's favor. *Regents of*

*Mercerburg College v. Republican Franklin Ins. Co.*, 458 F.3d 159, 163 (3d Cir.

2006).

B. Legal Standards Governing Deliberate Indifference to Serious Medical Needs.

The Eighth Amendment requires that prisoners receive access to basic medical treatment. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). However, "[o]nly 'unnecessary and wanton infliction of pain' or 'deliberate indifference to the serious medical needs' of prisoners are sufficiently egregious to rise to the level of a constitutional violation." *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

A prison official acts with deliberate indifference to a prisoner's medical needs only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). That is the equivalent of recklessness. *Id.* at 836-37. *See also* JA 1198 (district court noted that deliberate indifference "is a state of mind equivalent to reckless disregard of a known risk of harm") (citing *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 218 (D. N.J. 2000)).

In *Rouse, supra*, this Court noted that "[w]e have found 'deliberate indifference' in a variety of circumstances, including where the prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. . . . We also have found 'deliberate indifference' to exist where the

-24-

prison official persists in a particular course of treatment 'in the face of resultant

pain and risk of permanent injury.'" *Rouse*, 182 F.3d at 197 (citations omitted).

While "an inadvertent failure to provide adequate medical care cannot be said to

constitute an unnecessary and wanton infliction of pain or 'to be repugnant to the

conscience of mankind,'" *see White*, 897 F.2d at 109, several instances of flawed

medical treatment can establish a claim under the Eighth Amendment. *Rouse*, 182

F.3d at 197. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582-83 &

n.7 (3d Cir. 2003) (finding genuine issue of material fact on plaintiff's deliberate

indifference claim when jail knew plaintiff was insulin-dependent, never asked

plaintiff when he needed it, and only administered it 21 hours after plaintiff was

first jailed, resulting in plaintiff's stroke). And, it is beyond cavil that prison

officials may not choose an easier or less-efficacious treatment without regard to

the inmate's serious medical needs. *Monmouth Cty. Corr. Inst'l Inmates v.*

*Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

C. The Jury May Find that Dr. Martin was Deliberately Indifferent to Plaintiff's
   Serious Medical Needs_____.

"[W]hether or not a defendant's conduct amounts to deliberate indifference

has been described as a classic issue for the fact finder." *J.M.K.*, 372 F.3d at 588

(citations omitted). *See also Johnston v. Corr. Med. Servs.*, No. 05-5235, 2008

U.S. Dist. LEXIS 105127, at *20 (D.N.J. Dec. 23, 2008) ("Where there is evidence

of inadequate medical care, the question of subjective intent becomes critical and

is generally best left to the jury to decipher, with the help of live testimony and

cross-examination") (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68-69 (3d Cir.

1993) ("if we assume that Durmer received inadequate medical care, Dr.

O'Carroll's intent becomes critical: if the inadequate care was a result of an error in

medical judgment on Dr. O'Carroll's part, Durmer's claim must fail; but, if the

failure to provide adequate care in the form of physical therapy was deliberate, and

motivated by non-medical factors, then Durmer has a viable claim. It is therefore

important that the trier of fact hear Dr. O'Carroll's testimony in order to assess his

credibility, and that Durmer's counsel be permitted to explore the doctor's

motivation on cross-examination")).

1.   Dr. Martin Failed to Provide the Necessary Treatment for Plaintiff's
     Ulcerative Colitis, Worsening Dehydration, and Rapid Weight Loss,
     and Instead Repeatedly Discharged him from the Infirmary and
     Returned him to the General Prison Population                    .

Critical to the trial court's decision was its belief that Soto-Muniz did not

"offer[] evidence suggesting that Dr. Martin continued a course of conduct that he

knew was painful, ineffective, or entailed a substantial risk of serious harm to

plaintiff." (JA 25). In reaching this conclusion, the court below ignored that Dr.

Martin knew that plaintiff needed IV hydration, a GI consult and IV steroids (prednisone) in order to properly treat his worsening condition. Two days before Dr. Martin saw plaintiff for the first time, the medical records already noted the recommendation that plaintiff receive these treatments. (JA 1131-32, ¶ 16) When he first saw plaintiff on July 18, 2008, Dr. Martin noted his symptoms of ulcerative colitis and melena. He also saw that plaintiff appeared "chronically ill." (JA 61, ¶ 35).

Plaintiff's expert further noted that Dr. Martin disregarded the prior recommendations for treatment, even though he knew that plaintiff was suffering acutely. Dr. Martin did not indicate that he disagreed about the necessity of those treatments. Nonetheless, the only treatment Dr. Martin prescribed for plaintiff was hydrocodone and oral prednisone. (JA 1133-34, ¶ 18). Given plaintiff's condition and his medical history, there was no basis for any treating physician to determine that this was an appropriate or sufficient treatment for plaintiff's acute ulcerative colitis.

After plaintiff's July 18, 2008, meeting with Dr. Martin, his condition continued to worsen, even as he took the medications that Dr. Martin had prescribed. On July 19, 2008, plaintiff had a pulse of 117, characterized as tachycardia, a symptom of his severe dehydration. Plaintiff was experiencing

abdominal pain and his abdomen was distended, and continued to suffer from

frequent, bloody diarrhea. (JA 1133-34, ¶ 19). After suffering in the SWSP

infirmary for three days without proper medical care, plaintiff was seen by Dr.

Martin again on July 21, 2008. Dr. Martin noted that plaintiff complained of

diarrhea, abdominal pain, and melena. Despite these worsening symptoms, and

although the GI consult that had been ordered five days earlier had still not taken

place, Dr. Martin discharged plaintiff to the general prison population. (JA 1135-

36, ¶ 21; JA 1154-55). While in the general prison population, plaintiff's

condition worsened. (JA 1136-37, ¶¶ 23–24). On August 1, 2008, Soto-Muniz

returned to the Infirmary, and was seen by Dr. Martin later that day. Dr. Martin

noted plaintiff's continuing symptoms of acute ulcerative colitis, and measured his

pulse as 100, indicating tachycardia as a symptom of severe dehydration. He also

noted plaintiff's rapid weight loss, decreasing from 148 pounds on July 10, 2008

to 137 pounds on August 1, 2008. Moreover, plaintiff made numerous complaints

of pain and made repeated requests for treatment. (JA 1131-32, 1161). Yet, Dr.

Martin took no steps to address plaintiff's worsening condition; rather, he again

discharged plaintiff to the general prison population.

    As a direct consequence of Dr. Martin's deliberate indifference, plaintiff's

health rapidly deteriorated due to his acute ulcerative colitis. From plaintiff's

discharge to the general prison population for the second time until August 5, 2008, he was losing nearly two pounds of body weight per day, and his weight had dropped from 137 to 130 pounds. (JA 66, ¶ 56). Plaintiff's condition was so serious at this point that he was transferred to the hospital at SFMC on August 6, 2008. (JA 67, ¶ 59; JA 1137-38, ¶ 25). The physicians at SFMC had no choice but to perform surgery to remove his colon and rectum. (JA 85, ¶¶ 131-33). Accordingly, a condition that plaintiff had previously been able to manage successfully through conservative, non-surgical medical treatment was neglected to such a degree over the course of less than three weeks that this life-altering surgery became necessary.

Contrary to the district court's belief, Dr. Martin's failures were not merely negligent. He did not simply misread a medical record or forget to meet with plaintiff. And, he did not reasonably choose between two medical alternatives. *See Rouse*, 182 F.3d at 197 ("In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). Rather, Dr. Martin knew that plaintiff's condition was worsening, yet he continued with conservative medical treatments that were not working. *Id.* ("'Deliberate indifference ...

-29-

requires 'obduracy and wantonness,' which has been likened to conduct that

includes recklessness or a conscious disregard of a serious risk"). As this Court

has held, the jury may find deliberate indifference to serious medical needs when

the prison official "persists in a particular course of treatment 'in the face of

resultant pain and risk of permanent injury.'" *Rouse*, 182 F.3d at 197. The

persistent course of treatment that Dr. Martin pursued led to a medical emergency

that resulted in the removal of plaintiff's colon and rectum. *White*, 897 F.2d at

109.

2.    Dr. Martin was Deliberatively Indifferent by Failing to
      Make a Sufficient Effort to Obtain an Urgently Necessary
      Gastrointestinal Consult for Plaintiff                          .

Although treating providers including nurses at SWSP (and CRAF)

noted in the medical records Soto-Muniz's need for a GI consult on his acute

ulcerative colitis, Dr. Martin failed for weeks to obtain this for plaintiff. This

failure resulted in harmful non-escalation of the level of care, as a

gastroenterologist would have recognized the severity of plaintiff ulcerative colitis

and advised that such care be provided to him. (JA 1130-31, ¶ 11). Dr. Martin's

delay in ensuring that plaintiff obtained the necessary GI consult – even though he

knew plaintiff needed one – constituted deliberate indifference to plaintiff's

serious medical needs. Put simply, there was no reason for the prolonged delay.

-30-

*Rouse*, 182 F.3d at 197 ("We have found 'deliberate indifference,' ... including where the prison official ... delays necessary medical treatment based on a non-medical reason").

In granting summary judgment to Dr. Martin, the district court held that, while "both parties acknowledge that a consultation was requested and approved [for a GI consultation] ... [O]nce Martin requested a consult, it was up to other administrative officials to approve and schedule the necessary consult." (JA 26). The district court concluded, "not only was Martin's decision to request a GI consult the sort of decision the Court generally will not review in the context of an Eighth Amendment claim, a consult was in fact requested by Martin shortly after Plaintiff's arrival at SWSP, and the determination to approve and schedule the consult was made by other individuals." (JA 27). Yet, requesting a GI consult and then failing to follow-up to protect a medically-vulnerable patient-inmate is by definition deliberately indifferent to serious medical needs. As Dr. Turner stated,

> Simply placing a consultation does not result in any
> benefit for a patient. It is the responsibility of healthcare
> providers to follow up on consultations called on behalf
> of patients. This follow up is all the more important in
> ill patients such as Mr. Soto-Muniz. I do not disagree
> that a GI consult was appropriately ordered on 7/16/2008
> by Dr. Melendez. On 8/1/2008, the record states "GI
> consult pending" but there is no indication that a GI
> physician was called or contacted again on this date.  It

-31-

Contrary to the trial court's opinion, Dr. Turner offered much more than mere disagreement with Dr. Martin's judgment. After reviewing plaintiff's medical records and the sequence of events leading up to the removal of Soto-Muniz's colon, Dr. Turner noted that as plaintiff's health continued to deteriorate, he should have been hospitalized immediately. (JA 1134-35, ¶ 19). Dr. Turner stated, "Any treating provider should have recognized that without intravenous access, the patient was not going to improve and need inpatient admission to a medical facility." (JA 1134-35, ¶ 19). Dr. Turner also noted that plaintiff did in fact receive IV treatment, based on "outside reports from a prior Emergency Room visit." (JA 1136, ¶ 22). In addition, despite the inaccessibility of plaintiff's veins due to drug use, "[t]here are alternative sites of IV access in the body that we use as healthcare providers in the case of challenging anticubital. Some need to be performed in a hospital facility and in this case a practitioner should refer the patient to a facility with such capability." (JA 1158, ¶ 2). In sum, contrary to the district court's ruling, crediting Dr. Turner's opinion, the jury could find that Dr. Martin disregarded a substantial risk of harm in continuing the oral hydration and medication.

The district court further held that plaintiff was examined multiple times by Dr. Martin and SWSP personnel, and that "each time Plaintiff was transferred back

`

to general population, Martin examined Plaintiff, noted that his vital signs were 'good' and 'stable,' and determined that because he did not find 'anything acute going on that warranted [Plaintiff] to be in [the Infirmary,' Plaintiff should be discharged." (JA 25-26). Upon plaintiff's discharges into general population on July 21, 2008 and August 1, 2008, the district court found, Dr. Martin concluded that plaintiff was "feeling better" and there was nothing "acute going on." (JA 26). The district court concluded, "Whether or not Martin's decision was ultimately incorrect, or even negligent, Plaintiff does not dispute that Martin was qualified to make such a judgment concerning Plaintiff's treatment plan, or that Martin did in fact exercise his 'professional judgment.'" (*Id.*)

This reasoning did not entitle Dr. Martin to summary judgment. As demonstrated above, plaintiff does not assert the mere existence of disagreement as to the course of his medical treatment at SWSP. Prison medical personnel, including Dr. Martin, persistently opted for an easier and less efficacious treatment of Plaintiff's condition, *i.e.*, oral hydration, rather than providing the care that they knew Plaintiff needed to treat adequately his condition, *i.e.*, IV hydration and IV medication. Dr. Turner established that medical staff, including Dr. Martin, exhibited "substantial delay in treating a patient with such a clear degree of dehydration and exacerbation of underlying ulcerative colitis." (JA 1132, ¶ 16).

-34-

On July 21, 2008, when plaintiff was first discharged into general population, no GI consultation had been obtained even though one had been requested. That day, plaintiff continued to complain about "diarrhea, abdominal pain, menena" and lower abdomen pain and pain and blood when he had a bowel movement." Rather than discharge plaintiff into the general population, Dr. Martin needed to admit him "to an inpatient facility for further management." (JA 1135-36, ¶ 21).

Plaintiff remained in general population for only a few days "with continued rectal bleeding" and other serious health conditions. (JA 1136, ¶ 23). When plaintiff was again discharged into the general population on August 1, 2008, "he should have been transferred to a facility capable of placing an IV or even central venous catheter (since a peripheral IV could not be obtained) to administer appropriate therapy." (JA 1137, ¶ 24). Sending plaintiff back into general population at this time was sufficiently reckless to violate the Eighth Amendment.

In sum, Dr. Martin and the medical personnel he supervised persisted in the same inadequate treatment of Soto-Muniz "went close to 4 weeks without IV fluid hydration or IV medications (steroids) to treat his underlying disease. The intravenous treatment modality of steroids and fluid hydration is essential and critical for the recovery of patients with ulcerative colitis. The lack of appropriate care and the subsequent delays in care resulted in surgical intervention due to the

presence of fulminant colitis." (JA 1138, ¶ 26). As such, Dr. Martin acted with deliberate indifference to Soto-Muniz's serious medical needs. *See e.g. Johnston*, 2008 U.S. Dist. LEXIS 105127, at *25-26 ("a reasonable fact-finder could conclude that Defendant Ahsan was deliberately indifferent when he persisted in prescribing Plaintiff MS Contin, despite Plaintiff's regular complaints of constant pain") (citing *White*, 897 F.2d at 109).

CONCLUSION

For the foregoing reasons, the judgment of the district court should be

vacated, the matter remanded to the district court for trial, together with such other

and further relief as is just and proper.

Dated:    April 29, 2016
          New York, New York

                        Respectfully submitted,

                        SCOTT A. KORENBAUM, ESQ.
                        11 Park Place, Suite 914
                        New York, New York  10007
                        (212) 587-0018

                        STEPHEN BERGSTEIN, ESQ.
                        BERGSTEIN & ULLRICH, LLP
                        15 Railroad Avenue
                        Chester, New York 10918
                        (845) 469-1277
                        Counsel for Plaintiff-Appellant

By: _____
              Scott A. Korenbaum

## CERTIFICATE OF BAR MEMBERSHIP

I, Scott A. Korenbaum, hereby certify pursuant to L.A.R. 46.1(e) that I am admitted to practice before the United States Court of Appeals for the Third Circuit.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

I, Scott A. Korenbaum, hereby certify that:

(1) The foregoing Brief for Plaintiff-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,038 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

(2) The foregoing Brief for Appellant complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Corel Word Perfect X7 in a 14-point Times New Roman font.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF SERVICE

I, Scott A. Korenbaum, hereby certify that on April 29, 2016, I filed the

foregoing Brief for Appellant and Joint Appendix on the Court's CM/ECF system,

and, as such, service was made upon the below counsel for appellees:

SEAN ROBINS, ESQ.
MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C.
6981 N. Park Drive, Suite 300
Pennsauken, NJ 08109
Counsel for Defendant-Appellee Allan Martin, M.D.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

I, Scott A. Korenbaum, hereby certify that the text appearing in both the electronic version and hard copy version of the foregoing Brief for Appellant is identical.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF VIRUS CHECK

I, Scott A. Korenbaum, hereby certify that a virus check was performed on the .pdf file of this brief using Microsoft Security Essentials Version 1.153.2007, and that no virus was found.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

I, Scott A. Korenbaum, hereby certify that the text appearing in both the electronic version and hard copy version of the foregoing Brief for Appellant is identical.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

## CERTIFICATE OF VIRUS CHECK

I, Scott A. Korenbaum, hereby certify that a virus check was performed on the .pdf file of this brief using Microsoft Security Essentials Version 1.219.254.0, and that no virus was found.

/s/ Scott A. Korenbaum
Scott A. Korenbaum

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

================================================

Docket No. 15-1874

------------------------------------

ELVIS SOTO-MUNIZ,

Plaintiff-Appellant,

-against-

ALLAN MARTIN; JOHN DOES #1-5, (said names being fictitious, as the true
names are presently unknown), individually and in their official capacities;
CORIZON, INC., FKA Correctional Medical Services, Inc.; DAVID MEEKER;
DR. LIONEL ANICETTE; YASSER SOLIMAN,

Defendants-Appellees.

------------------------------------

APPEAL FROM MARCH 10, 2015 ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY,
ROBERT B. KUGLER, J., NO. 1:10-CV-3617(RBK), GRANTING
SUMMARY JUDGMENT TO DEFENDANTS

================================================

JOINT APPENDIX VOLUME I (JA1-JA28)

================================================

SCOTT A. KORENBAUM, ESQ.
Attorney for Plaintiff-Appellant
11 Park Place, Suite 914
New York, New York 10007
(212) 587-0018

STEPHEN BERGSTEIN, ESQ.
BERGSTEIN & ULLRICH, LLP
Attorneys for Plaintiff-Appellant
15 Railroad Avenue
Chester, NY 10918
(845) 469-1277

# TABLE OF CONTENTS

Page

Notice of Appeal, dated and filed April 7, 2015 . . . . . . . . . . . . . . . . . . . . . A-000001

Order of the District Court, dated and filed March 10, 2015,
   granting defendants' motion for summary judgment . . . . . . . . . . . A-000002

Opinion of the District Court, dated and filed March 10, 2015,
   granting defendants' motion for summary judgment . . . . . . . . . . . A-000003

Docket Sheet Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-000029

Notice of Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . A-000048

Statement of Uncontested Facts in Support
   of Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . A-000050

Proposed Order Granting Motion for Summary
   Judgment and Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . A-000101

Exhibit A to Defendants' Motion for Summary
   Judgment – Plaintiff's Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . A-000104

Exhibit B to Defendants' Motion for Summary
   Judgment – Plaintiff's Amended Complaint . . . . . . . . . . . . . . . . . A-000118

Exhibit C to Defendants' Motion for Summary
   Judgment – Deposition of A. Martin, M.D. . . . . . . . . . . . . . . . . . A-000143

Exhibit D to Defendants' Motion for Summary
   Judgment – Deposition of Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . A-000484

Exhibit E to Defendants' Motion for Summary
   Judgment – Deposition of M. Patel, M.D. . . . . . . . . . . . . . . . . . . A-000573

Exhibit F to Defendants' Motion for Summary
   Judgment – Deposition of B. Shrager, M.D . . . . . . . . . . . . . . . . . A-000662

Exhibit G to Defendants' Motion for Summary
    Judgment – Deposition of L. Anicette, M.D. . . . . . . . . . . . . . . . . . A-000703

Exhibit H to Defendants' Motion for Summary
    Judgment – Deposition of Y. Soliman, M.D. . . . . . . . . . . . . . . . . . A-000763

Exhibit I to Defendants' Motion for Summary
    Judgment – Deposition of Fran Green . . . . . . . . . . . . . . . . . . . . . . A-000834

Exhibit J to Defendants' Motion for Summary
    Judgment – Deposition of James Courtney . . . . . . . . . . . . . . . . . . A-001010

Exhibit K to Defendants' Motion for Summary
    Judgment – Expert Report of L. Borowsky, M.D. . . . . . . . . . . . . . A-001070

Exhibit L to Defendants' Motion for Summary
    Judgment – Expert Report of N. Evans, M.D. . . . . . . . . . . . . . . . . A-001082

Exhibit M to Defendants' Motion for Summary
    Judgment – Supplemental Report of N. Evans, M.D. . . . . . . . . . . A-001090

Exhibit N to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001094

Exhibit O to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001095

Exhibit P to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001096

Exhibit Q-1 to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001097

Exhibit Q-2 to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001098

Exhibit Q-3 to Defendants' Motion for Summary
    Judgment – Receipt for Inmate Handbook . . . . . . . . . . . . . . . . . . A-001099[1]

Exhibit Q-4 to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001100

Exhibit Q-5 to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001101

Exhibit R to Defendants' Motion for Summary
    Judgment – NJ Department of Corrections
    Inmate Remedy System procedures . . . . . . . . . . . . . . . . . . . . . . . . A-001102

Exhibit S to Defendants' Motion for Summary
    Judgment – Filed Under Seal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001122

Declaration of Kim E. Richman in Support of Plaintiff's
    Opposition to Defendants' Motion For Summary Judgment . . . . . A-001123

Exhibit 1 to Richman Declaration – Expert Report of
    Brian G. Turner, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001125

Exhibit 2 to Richman Declaration – Rebuttal Expert Report
    of Brian G. Turner, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001152

Plaintiff's Responsive Statement of Material Facts . . . . . . . . . . . . . . . . A-001165

Certification of Counsel for Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . A-001203

Exhibit O to Defendants' Motion for Summary
    Judgment – Plaintiff's medical records from
    Bergen Regional Medical Center . . . . . . . . . . . . . . . . . . . . . . . . . . A-001207

---

[1] Exhibits O, P, Q-1, Q-2, Q-4, Q-5 and S to Defendants' Motion for Summary Judgment contain appellant's medical records. They are being filed under seal in a separate appendix.

Exhibit P to Defendants' Motion for Summary
    Judgment – Plaintiff's inmate electronic medical
    records from NJ Department of Corrections . . . . . . . . . . . . . . . . . . A-001333

Exhibit Q-1 to Defendants' Motion for Summary
    Judgment – Plaintiff's GI consult referral form,
    dated July 21, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001615

Exhibit Q-2 to Defendants' Motion for Summary
    Judgment – Plaintiff's Medication Administration
    Records, July - August 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001616

Exhibit Q-4 to Defendants' Motion for Summary
    Judgment – Plaintiff's NJ Department of Corrections
    Reception Center/Substance Abuse Data form . . . . . . . . . . . . . . . . A-001626

Exhibit Q-5 to Defendants' Motion for Summary
    Judgment – Plaintiff's Health Services
    Request Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001630

Exhibit S to Defendants' Motion for Summary
    Judgment – Plaintiff's NJ Department of Corrections
    medical records "hard chart" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001635

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Full Caption in District Court:                    Docket No.:
                                                   1:10-CV-03617-RBK-KMW
ELVIS SOTO-MUNIZ

              (Plaintiff)                          Judge: ROBERT B. KUGLER

        v.                                         **Notice of Appeal to the**
                                                   **U.S. Court of Appeals for the**
              (Defendant)                          **Third Circuit**
CORIZON, INC., F/K/A CORRECTIONAL MEDICAL SERVICES, INC.; DR. ALLAN MARTIN; DR. LIONEL ANTICETTE;
DR. YASSER SOLIMAN; and "JOHN DOES" #1-5  (said names being fictitious, as the true names are presently
unknown), Individually and in their Official Capacities.

      Notice is hereby given that ___ELVIS SOTO-MUNIZ_____
                                       (Named Party)
      appeals to the United States Court of Appeals for the Third Circuit from

      [ ] Judgment, [ ] Order, [ ] Other Granting Defendants' Motion for Summary Judgment_____
                                              (Specify)
      of the United States District Court, District of New Jersey, entered in this action on

      March 10, 2015_____.
      (Date)

Dated: April 7, 2015                               ELVIS SOTO-MUNIZ_____
                                                   Appellant

                                                   5 Howard Court_____
                                                   Street

                                                   Staten Island, NY 10310_____
                                                   City, State, Zip

                                                   (347) 457-0114_____
                                                   Telephone

**JA - 000001**

NOT FOR PUBLICATION                                      (Doc. No. 113)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| ELVIS SOTO-MUNIZ,<br><br>                    Plaintiff,<br><br>         v.<br><br>CORIZON, INC. f/k/a CORRECTIONAL<br>MEDICAL SERVICES, INC., et al.<br><br>                    Defendants. | Civil No. 10-3617 (RBK/KMW)<br><br>**ORDER** |

**KUGLER**, United States District Judge:

   **THIS MATTER** having come before the Court upon the Motion for Summary Judgment

of Defendants Corizon, Inc. f/k/a Correctional Medical Services, Inc., David Meeker, Dr. Allan

Martin, and Dr. Yasser Soliman (collectively "Defendants") (Doc. No. 113), and the Court

having considered the moving papers, and the responses thereto, and for the reasons expressed in

the Opinion issued this date;

   **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No.

113) is **GRANTED**.

Dated:___3/10/2015___                          _s/ Robert B. Kugler_
                                               ROBERT B. KUGLER
                                               United States District Judge

**JA - 000002**

NOT FOR PUBLICATION                                                    (Doc. No. 113)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| ELVIS SOTO-MUNIZ, | : |
| Plaintiff, | : |
| v. | : |
| CORIZON, INC. f/k/a CORRECTIONAL MEDICAL SERVICES, INC., et al. | : |
| Defendants. | : |

Civil No. 10-3617 (RBK/KMW)

**OPINION**

**KUGLER**, United States District Judge:

This matter arises out of Elvis Soto-Muniz's ("Plaintiff") incarceration at South Woods State Prison ("SWSP"). During a two-week period, Plaintiff claims to have been deprived of adequate medical treatment in violation of his constitutional rights. Defendants in this action are Corizon, Inc. f/k/a Correctional Medical Services, Inc. ("CMS"), David Meeker ("Meeker"), Dr. Allan Martin ("Martin"), Dr. Lionel Anicette ("Anicette"), and Dr. Yasser Soliman ("Soliman") (collectively "Defendants"). The matter is currently before the Court on Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. No. 113).

For the reasons hereinafter recited, Defendants' Motion will be **GRANTED**.

## I.    FACTUAL BACKGROUND[1]

Plaintiff suffers from ulcerative colitis, an inflammatory bowel disease. (Amended Complaint ("Compl.") ¶ 19; Defs.' Statement of Uncontested Facts ("Defs.' SMF") ¶ 9.)[2] Prior to July and August of 2008, Plaintiff managed his ulcerative colitis with medication and the occasional "professional medical intervention in a clinical or hospital setting." (Id.) However, "if [ulcerative colitis] symptoms cannot be controlled, a surgical removal of the colon and rectum may be required." (Id.)

In May of 2008, Plaintiff presented at Bergen Regional Medical Center ("BRMC") with complications resulting from his ulcerative colitis and was admitted for treatment. (Id. ¶ 11.) Plaintiff responded well to this treatment and was subsequently discharged from BRMC. (Id.) After being sentenced in connection with a criminal matter and held at the Bergen County Jail, (Compl. ¶ 29), on or about July 10, 2008, Plaintiff was transferred to the custody of the New Jersey State Department of Corrections ("NJDOC") and sent to NJDOC's Central Reception and Assignment Facility ("CRAF"). (Defs.' SMF ¶¶ 12, 24.)

On July 10, 2008, Plaintiff was seen at CRAF Nursing Intake by Giselle Williams, LPN, who noted on Plaintiff's Electronic Medical Record ("EMR") that Plaintiff had been hospitalized two months earlier, and had a history of hepatitis C and ulcerative colitis. (Id. ¶ 25.) Nurse Williams also noted that Plaintiff had been on the medications Asacol and Omeprazole. (Id.) That same day, Plaintiff was seen at Physician Intake by Sharon Levin, RN, NP, who noted

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

[2] The Court references Defendants' Statement of Uncontested Facts ("Defs.' SMF") for all facts that are not disputed by the parties. See Hill v. Algor, 85 F. Supp. 29 391, 408 n.26 (D.N.J. 2000) ("[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.")

2

Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding. (Id. ¶ 26.) Nurse Levin also noted Plaintiff's history of IV drug use and use of cocaine, and placed Plaintiff on Sulfasalazine 500 mg, three times per day and Prilosec 20 mg daily. (Id.) Finally, Nurse Levin also ordered lab testing. (Id.) The lab test results were received on July 11, 2008, including results for CBC and platelets. (Id. ¶ 27.)

On July 15, 2008, Plaintiff was seen at Sick Call with Phyllis Hewins, RN, with a complaint that his "meds [were] not working for ulcerative colitis," that he had nausea for three days, and that he was not able to eat, though he was drinking liquids. (Id. ¶ 28.) He also reported being in pain, with cramping and a "small amount of loose BM." (Id.) For his pain, Plaintiff was provided with Acetaminophen 325 mg, two tablets two to three times daily, and provided with a supply to self-dispense. (Id.)

The next day, July 16, 2008, Plaintiff was again seen at Sick Call, this time with Grace Melendez, M.D., with a complaint that he felt lightheaded. (Id. ¶ 29.) During his visit with Dr. Melendez, Plaintiff reported that he had ulcerative colitis for the past seven years and that he had been hospitalized eight times since September 2007. (Id.) In her notes, Dr. Melendez recorded that Plaintiff's illness was chronic, that he needed IV hydration, prednisone, and a gastrointestinal ("GI") consult, and that Plaintiff had been accepted for transfer to the infirmary at SWSP. (Id.)

Plaintiff was transferred to SWSP on July 17, 2008. (Id. ¶ 30.) Upon arrival at SWSP, he was seen by Jennifer Kuty, RN, during a Nurse Transfer Admission Assessment. (Id.) Nurse Kuty noted that Plaintiff stated he had no appetite, had been "bleeding rectally for a month" but that he had not vomited blood; noted Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding; and noted that Plaintiff was taking Sulfasalazine 500 mg, three times per

3

day, Prilosec 20 mg, daily, and Acetaminophen 325 mg, two tablets two to three times per day.
(Id.) Lisa Renee Mills, RN, also noted an order upon admission to the infirmary, to "push oral
fluids," and for administration of IV fluids for dehydration for Plaintiff that day. (Id. ¶ 31.) That
same day, Gail Willett, RN, saw Plaintiff as part of Infirmary Rounds Admission, and noted that
Plaintiff told her he felt nauseous "on and off," but that he was experiencing no vomiting. (Id. ¶
32.) Plaintiff also related that he had a seven year history of ulcerative colitis, diabetes mellitus,
and a history of rectal bleeding, including "intermittent" rectal bleeding during the prior month.
(Id.) Nurse Willett noted that Plaintiff presented "pale in color" and "slightly dehydrated" and
that he stated that he had abdominal pain due to his colitis. (Id.) She also noted that Plaintiff's
weight was 139 pounds. (Id.) Finally, Nurse Willett noted that she had attempted to start an IV
for administration of fluids "but due to extensive heroin use of veins" she was "unable to start
line after [six] attempts." In lieu of an IV, she explained that Plaintiff was given oral fluids and
encouraged to drink as much as he could, which Plaintiff agreed to comply with. (Id.)

Plaintiff was seen in Infirmary Rounds on July 18, 2008 by Linda Bigay, RN, James R.
Welch, RN, Clevelyn Ricalde, RN, Stephanie Kulda, RN, and Martin. (Id. ¶¶ 33-37.) Nurse
Bigay noted that she had attempted to insert a heparin lock unsuccessfully, and had instructed
Plaintiff to continue drinking copious amounts of fluids until the next nurse came to insert a
"Hep-lock." (Id. ¶ 33.) She also noted Plaintiff's weight to be 139 pounds. (Id.) Later, James
R. Welch, RN, noted Plaintiff's complaint of diarrhea. (Id. ¶ 34.) After Martin saw Plaintiff,
Nurse Ricalde noted that Plaintiff was alert and "oriented x3," with regular respirations, but
complained of abdominal pain and diarrhea. (Id. ¶ 36.) Nurse Ricalde also "encouraged more
fluid intake" for Plaintiff. (Id.) When Nurse Smith saw Plaintiff, she too noted that he was alert
and "oriented x3," but that he had not eaten breakfast due to his abdominal pain. (Id. ¶ 37.) She

4

JA - 000006

recorded that she provided Plaintiff with Boost (a liquid nutritional supplement), and that there were no complaints of diarrhea during her shift. (Id.) Plaintiff was again encouraged to drink more water, which he expressed assent to, and his weight was recorded at 139 pounds. (Id.)

Martin had not seen Plaintiff on July 17 because he had not been working that day. (Id. ¶ 65.) When Martin saw Plaintiff for the first time on July 18, 2008, he examined and evaluated Plaintiff. (Id. ¶ 35.) Martin claims that Plaintiff's SWSP intake records from July 17, 2008, indicated that his vital signs were stable and that he was hemodynamically stable. (Id. ¶ 68.) Plaintiff appeared chronically ill, pale, alert, and responsive, but did not appear to be in any acute distress. (Id. ¶ 71.)[3] As part of his GI examination of Plaintiff, Martin noted some tenderness in the abdomen, which was not distended, noted no peritoneal irritation, and, other than the tenderness in the lower abdomen, the exam was normal. (Id.) Plaintiff was started on further treatment for his symptoms, including additional anti-inflammatory medication and stronger pain medication. (Id. ¶¶ 70, 73.) Plaintiff was given Prednisone along with Prilosec, and Vicodin[4] instead of acetaminophen. (Id. ¶ 70.) According to Martin, Plaintiff was not placed on Remicade, one of the medications used to medically control ulcerative colitis, because Martin had prescribed Sulfasalazine and Prednisone, which together will also generally control

---

[3] The Court notes that, in several instances found in Plaintiff's Responsive Statement of Material Facts, Plaintiff attempts to dispute a fact asserted and supported from the record by Defendants, without supporting his position with a citation to the record, or by attempting to deny a fact not actually asserted by Defendants. (See e.g., Pl.'s Responsive Statement of Material Facts ("Pl.'s RSF") ¶¶ 14, 17, 18, 68, 71, 73, 74, 75, 94, 97, 104, 105, 164, 187, 190.) Such assertions are insufficient to create an actual dispute of fact, and the Court will regard these paragraphs as undisputed for purposes of this Motion. See Walters v. Carson, No. 11-6545, 2013 WL 6734257, at * (D.N.J. Dec. 19, 2013) (noting that, where the plaintiff denied the defendants' material fact. but cited to no record evidence and offered only argument in response, legal argument alone "fails to satisfy Plaintiff's obligation under Local Rule 56.1."); Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth., No. 12-3427, 2014 WL 268652, at *5 n.4 (D.N.J. Jan. 23, 2014) (admonishing the defendant for claiming facts were disputed when they were not, and noting that "any statement that is not explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted.")

[4] It appears Plaintiff was in fact prescribed Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily. (See, e.g., Defs.' SMF ¶¶ 49, 57.)

ulcerative colitis. (Id. ¶ 86.) He testified that "there was no way to get an IV" in Plaintiff's veins "due to heroin use," so Plaintiff would need to continue "hydration by mouth," which he had been doing. (Id. ¶ 73.) Martin also believed that the only form of available IV hydration that could have been obtained in light of Plaintiff's condition was with a subclavian line, which would have needed to be done in a hospital setting. (Id. ¶ 75.) Because Plaintiff was able to and was taking hydration orally, Martin determined that an IV was not necessary. (Id. (testifying at his deposition that "[Plaintiff] was eating. He was drinking. If someone is eating and drinking, there is no need to [administer IV hydration]. If they're clinically stable, there is no need to do this; hemostatically stable, there is no need to do it.")) He noted that CRAF had also had a problem getting an IV in Plaintiff, which is why he was passed on to SWSP, but because Plaintiff was not throwing up, they would continue to encourage as much oral liquid and supplemental intake as possible. (Id. ¶¶ 73-75 (also testifying that CRAF "recommended an IV hydration. We did not do that. This came with him.")) Finally, Martin generated a request for a GI consult that day as well. (Id. ¶ 72.)

Plaintiff continued to be seen in Infirmary Rounds between July 19 and 21, 2008. (See id. ¶¶ 38-43.) Christina Gray, RN saw Plaintiff on July 19, noting Plaintiff was alert and oriented, in no distress, but had complaints of symptoms of weakness and anorexia. (Id. ¶ 38.) Plaintiff also admitted to Nurse Gray that he had eaten breakfast and had been utilizing supplements, such as Boost, for added nutrition. (Id.) Nurse Gray recorded Plaintiff's weight at 139 pounds. (Id.) On July 20, Plaintiff was seen by Nurse Welch, who noted Plaintiff's complaints of diarrhea with blood, a change in bowel habits, and abdominal pain, but also noted that there had been "no diarrhea this shift." (Id. ¶ 39.) She also noted Plaintiff's weight was 139 pounds. (Id.) Later, Nurse Kulda saw Plaintiff and noted that he was alert and oriented, that he

6

appeared weak, that he had a history of ulcerative colitis and diarrhea, but that there had been "no diarrhea this shift." (Id. ¶ 40.) Nurse Kulda also noted that Plaintiff was "drinking fluids," but was "tolerating little foods," though he "denied urinary problems." (Id.) Plaintiff's weight was also 139 pounds. (Id.) Nurse Gray also saw Plaintiff on July 20, noting that he was alert and oriented, in no apparent distress, but had "continued diarrhea." (Id. ¶ 41.) According to Nurse Gray, Plaintiff had "no new complaints," and was "increasing fluids as instructed." (Id.) Plaintiff's weight was still at 139 pounds. (Id.) On July 21 Nurse Bigay saw Plaintiff, noting that he denied having any loose stools during her shift, but that he would let her know if any occurred. (Id. ¶ 42.) She also noted that Plaintiff told her he was feeling better, and recorded his weight at 139 pounds again. (Id.) Nurse Welch saw Plaintiff that day as well, noting Plaintiff's weight to be 139 pounds. (Id. ¶ 43.)

Martin saw Plaintiff for the second time on July 21, at which time he examined and evaluated Plaintiff, noting complaints of fatigue and malaise, with diarrhea, abdominal pain, and melena, though Plaintiff denied having any nausea, vomiting, or constipation. (Id. ¶ 44.) Plaintiff's complaints of abdominal pain were "mostly in the lower abdomen," and his "number of stools [had] decreased since 3 days [prior]," though he did report that his stools were bloody. (Id.) Martin wrote that the plan was discharge Plaintiff to general population, and he ordered lab testing and a GI consult. (Id.) On July 21, 2008, Martin completed and submitted a consult referral form for the Plaintiff for a GI consult, noting in the referral request that "[Plaintiff] has [a history of] ulcerative colitis, that has been refractory to several medical treatments. He states that he has been on asacol, remicade, and prednisone at various times [without] success. He has cont[inued] to have abd[ominal] pain and rectal bleeding. [Please] evaluate." (Id. ¶ 46.) Yasser Soliman, M.D., signed off on the request on July 22, 2008, and on July 23, 2008, Carmen

7

Gaebler, RN, approved the request. (Id.) The GI consult was scheduled to take place on August 13, 2008 at New Jersey State Prison ("NJSP"). (Id.)

On July 21, 2008, Plaintiff was discharged to the general population, with instructions provided by Nurse Ricalde, who told Plaintiff to "go to med line to get his medications," and to "report to medical for any symptoms." (Id. ¶ 45.) Nurse Ricalde noted that Plaintiff verbalized his understanding of those instructions, told her he was feeling better, and "left the unit ambulatory and in no distress." (Id.)

Four days later, on July 25, 2008, Plaintiff was seen at Sick Call by Mary Ellen Green, RN, who noted Plaintiff complained of nausea, hematochezia (blood in his stools), poor appetite, and weakness, but that he denied any vomiting, diarrhea, constipation, change in bowel habits, abdominal pain, or melena at the time. (Id. ¶ 49.) Nurse Mary Ellen Green also noted that Nurse Fran Green had spoken with Plaintiff with respect to his "plan of care," and told Plaintiff that there was a GI consult pending and lab testing had been ordered for the following Monday. (Id.) Plaintiff also indicated to Nurse Mary Ellen Green that he was aware of his needs for fluid and rest, and she noted further that his current medications included Sulfasalazine 500 mg, three times daily, Prilosec 20 mg, daily, Prednisone 20 mg, two tablets daily, Twocal HN Liquid (nutritional supplement), one can three times daily, and Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily. (Id.) On July 30, 2008, Jackyline Carrero, health services technician ("HST II"), noted that lab testing, including a comprehensive metabolic panel ("CMP"), CBC, and platelets had been ordered by Martin, and drawn. (Id. ¶ 50.) Martin reviewed and charted the results of Plaintiff's lab testing on August 1, 2008. (Id. ¶ 52.)

Nurse Fran Green saw Plaintiff at Sick Call on August 1, noting that he complained of nausea, abdominal pain, melena, hematochezia, loss of appetite, and weight loss, though he

8

denied any vomiting or diarrhea at the time. (Id. ¶ 51.) Nurse Fran Green noted as the plan:
"Admit to infirmary for IVF and steroid therapy," and noted that lab testing had been ordered
and obtained on July 30, and that a GI consult was pending. (Id.) She also noted at the time that
Plaintiff weighed 133 pounds. (Id.) Plaintiff was transferred to the Infirmary at that time. (Id.)

Martin saw Plaintiff in Infirmary Rounds later on August 1, after he had been transferred
to the Infirmary, and noted that Plaintiff complained of anorexia, weight loss, abdominal pain,
and hematochezia. (Id. ¶ 53.) Plaintiff was "chronically ill appearing," was in bed, but was in
no apparent distress. (Id.) At the time, Martin noted that the GI consult was pending, scheduled
for August 13, 2008, that they were to continue "supportive care." (Id.) Because Martin did not
find "anything acute going on that warranted him to be in [the Infirmary]," and noted that
Plaintiff's weight was stable and his blood pressure was good, Plaintiff was discharged to
general population. (Id. ¶¶ 53, 94.) A stool occult blood test was also ordered and obtained on
August 1, and on August 5, 2008, the results of that test, which were "negative," were received
and charted by Avynne Hester, PA-C. (Id. ¶ 55.)

On August 4, 2008, Plaintiff submitted a Health Services Request Form ("HSRF"), in
which he stated that he wanted to check on the results of lab testing, and that he "lost 27 lbs. and
[could] no longer walk or control [his] bowel movement." (Id. ¶ 54.) He further stated a request
for "antibiotics, steroids and fluids intravenously to control my colitis problem." (Id.) The
HSRF notes that he was "Triaged 8/4/08." (Id.) On August 5, 2008, Plaintiff was seen at Sick
Call by Nurse Mary Ellen Green, consequent to his HSRF. (Id. ¶ 56.) Nurse Mary Ellen Green
noted complaints of anorexia, fatigue, malaise, and weight loss, and that Plaintiff denied
vomiting, constipation, and melena. (Id.) She noted that "[Plaintiff] persists in having loose
bloody stools and is up most [nights] in [the bathroom] and not able to sleep." (Id.) Plaintiff's

9

weight was 130 pounds at that time, and Nurse Mary Ellen Green noted that his "[c]olor [was] sallow and [his] face drawn in appearance with dark circles and sunken eyes." (Id.) She provided Plaintiff with a wheelchair, and wrote that he needed a lower floor and bunk due to his "present weakness and malaise." (Id.) Plaintiff's medications were also noted as Sulfasalazine 500 mg, three times daily, Prilosec 20 mg, daily, Prednisone 20 mg, two tablets daily, Twocal HN Liquid, one can three times daily, and Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily. (Id. ¶ 57.) Nurse Fran Green also ordered an "increased fluid intake" and "bottom floor, bottom bunk, and [wheelchair]" for Plaintiff on August 5. (Id.)

Plaintiff was seen by Nurse Fran Green the morning of August 6, 2008, in an "Office Visit – Follow Up," at which she examined and evaluated him. (Id. ¶ 58.) At that time, Nurse Green noted that Plaintiff weighed 132 pounds, his blood pressure was 110 over 80, and he had a pulse of 100 beats per minute. (Id.) Plaintiff complained of anorexia, fatigue, malaise, and weight loss, and appeared thin and malnourished, with "generalized weakness." (Id.) He further complained of nausea, diarrhea, abdominal pain, and blood in his stool, though denied vomiting. (Id.) Following her examination with Plaintiff, Nurse Fran Green contacted Martin and reviewed her evaluation and assessment with him. (Id. ¶ 59.) Martin agreed with Nurse Fran Green's assessment, and she noted in Plaintiff's EMR, "[r]eviewed with Dr. Martin; send to [St. Francis Medical Center] via state van for follow-up [treatment]." (Id.) Nurse Fran Green then charted the order for Plaintiff to be sent to St. Francis Medical Center ("SFMC") ER "via State Van for medical evaluation and [treatment]." (Id.) Shortly after arriving at SFMC, Plaintiff underwent a surgery to remove his colon, and a few months after that underwent a second surgery to remove his rectum. (See id. ¶¶ 131, 133, 204.)

10

Plaintiff does not dispute any of the events that occurred, but does dispute whether the medical decisions made by Martin and others were knowingly inadequate. (See Pl.'s Opp'n at 11.) He relies on the expert medical opinion reports of Brian G. Turner, M.D. ("Turner"), in support of his position. (See Ex. 1 to Richman Decl., Expert Medical Opinion Report of Brian G. Turner, M.D. ("Turner Report"); Ex. 2 to Richman Decl., Rebuttal to Expert Reports of Dr. Larry Borowsky and Dr. Nathaniel Evans ("Turner Rebuttal").) Turner opined that Plaintiff's care was "not only delayed, but also inadequate based on the severity of his known disease (established based on prior records reviewed by the treating individuals in this case)." (Turner Report ¶ 11.) He claims that the treating individuals did not seek or insist on a higher level of care for Plaintiff in the medical center, even though they recognized the need to place an IV line and check labs, but "could not perform what they knew was appropriate" in the Infirmary. (Id.) According to Turner, the issues with Plaintiff's treatment included: the failure to treat Plaintiff's dehydration without intravenous fluid ("IVF") and an IV, improper medication being given to Plaintiff, no GI consultation was performed, no acknowledgment by medical staff of Plaintiff's medical signs indicating severe dehydration, delay in care on multiple occasions, and severe exacerbation of ulcerative colitis due to poor care, which necessitated surgical intervention. (Id. ¶ 13.) The treating officials failed to diagnose, treat, or adequately acknowledge that:

- As a result of her July 16, 2008, examination of Plaintiff at CRAF, Dr. Melendez indicated that he needed "IV hydration," a "GI consult," and "prednisone." (Id. ¶ 16.)

- Plaintiff's tachycardia (high pulse rate), which indicated a degree of dehydration, manifested as early as July 15, 2008 (See id. ¶¶ 15-16, 19.) When Plaintiff had a

11

pulse of 117 on July 19, 2008, he should have been hospitalized due to his tachycardia and lack of IV fluid access. (Id. ¶ 19.)

- Plaintiff's complaints of tasting blood in his mouth, rectal bleeding for an extended period of time, and pain in his eyes were all signs of severe dehydration and disease. (Id. ¶ 17.) A healthcare provider should understand and recognize that severe dehydration from fluid (diarrhea) and blood loss (rectal bleeding) can result in damage to organs such as the kidneys and colon. (Id. ¶ 18.)

- Plaintiff's treatment providers should have considered that he would be severely anemic (low blood count) due to his long term bleeding, and this would contribute to his dehydration and the worsening of his ulcerative colitis flare. The fact that they requested a CBC shows they recognized this possibility. (Id. ¶ 19.) Plaintiff's lower blood pressure and tachycardia put him at risk of kidney compromise and possible damage to the colon as the result of low blood flow, without proper IV fluid hydration. (Id. ¶ 18.)

- IV access to facilitate the administration of IV steroids (Prednisone) and hydrating fluids were critical to the treatment of Plaintiff's ulcerative colitis and dehydration. (Id.) By July 20, 2008, given the persistence of Plaintiff's tachycardia, oral hydration was clearly inadequate. (Id. ¶ 20.) Plaintiff's oral steroids and liquid nutritional supplements were insufficient to hydrate him in the instance of severe active colitis, and he should have been receiving IV steroids and fluids. (Id. ¶ 24.)

- Plaintiff's severe dehydration as of July 21, 2008, indicated that he should have be admitted to an inpatient facility, rather than placed in general population. (Id.

12

¶ 21.) He should have been transferred to a facility capable of placing an IV or even a central venus catheter. (Id. ¶ 24.) In total, Plaintiff went close to four weeks without IV fluid hydration or IV medications to treat his underlying disease.

- Plaintiff needed a GI consult, and though Martin requested a GI consult on July 18, 2008, it appears it was not until after his second GI consult request on July 21, 2008, that his request was granted. (See id. ¶ 21.) The GI consult was not performed before Plaintiff was transferred to SFMC. (See id. ¶ 13.)

According to Turner, the "lack of appropriate care and the subsequent delays in care resulted in surgical intervention due to the presence of fulminant colitis." (Id. ¶ 26.)

Conversely, Defendants claim the actions of the individuals who treated Plaintiff in July and early August 2008 were reasonable under the circumstances. They assert Martin was reasonable in deciding to place Plaintiff in general population on July 21, 2008, and August 1, 2008, that treatment with oral hydration was adequate under the circumstances, and Plaintiff was scheduled for a GI consult as soon as practicable within the context of SWSP's approval process for such examinations.

Martin testified that Plaintiff was clinically stable each time he was transferred from the Infirmary back to general population. (Defs.' SMF ¶¶ 77, 94, 97.) The lab results from testing ordered at CRAF on July 11, 2008, indicating a normal blood count and having no indication of any acute problem, were available to Martin in Plaintiff's EMR on July 18, 2008. (Id. ¶ 81.) On July 21, 2008, Martin noted that Plaintiff appeared stable from his exam, and able to enter general population. (Id. ¶ 77.) Plaintiff's blood pressure was 120 over 70, his heart rate was at 88 beats per minute, he complained of nausea and some diarrhea, but he was feeling better on

13

that day and the number of his stools had decreased. (Id.) Martin did not believe that Plaintiff

was "acutely ill enough to be in the infirmary in the extended care unit." (Id.) Plaintiff's change

in results between July 12, 2008, and August 1, 2008, indicated to Martin a chronic or "slow

bleed," rather than an acute bleed. (Id. ¶ 96.) He testified that, most of the time, when there is

bleeding with ulcerative colitis, it is a "slow, chronic bleed that's occurring as opposed to a

massive, sudden gush of bright red blood." (Id. ¶ 84.) Martin also explained that the types of

treatment needed for ulcerative colitis depend on whether the condition is active or acute. (Id.)

According to Martin, a body adjusts to a "slow bleed" over time. (Id. ¶ 96.) Martin testified that

Plaintiff's ulcerative colitis was chronic, that it "waxe[d] and wane[d]," (id. ¶ 85), and that prior

to Plaintiff's transfer to SFMC it was "not obvious" that Plaintiff was not responding to the

medications being given. (Id. ¶ 93.) It was not until August 6, 2008, when Plaintiff had failed to

respond to treatment after "almost three weeks," and had presented to Nurse Fran Green for the

last time, that Martin decided Plaintiff needed to be sent to SFMC for an evaluation prior to his

GI consult. (Id. ¶¶ 99-101.) At that time, Plaintiff was experiencing an "acute flare," according

to Martin, and Plaintiff's chart indicated that he "might require a total colectomy for relief of his

intractable colitis symptoms." (Id. ¶ 91.)

Moreover, if an inmate was sent to the Infirmary for the purpose of IV hydration, and the

plan changed to oral hydration due to an inability to start an IV, there would be no reason for the

patient to remain in the Infirmary. (Id. ¶ 108.) Defendants believed that oral hydration was an

acceptable alternative to IV hydration where it was not possible to start an IV due to Plaintiff's

prior drug use. (See, e.g., Ex. C to Robins Cert., Deposition Testimony of Martin ("Martin

Dep.") at 168-69; id. Ex. I to Robins Cert., Deposition Testimony of Nurse Fran Green ("Green

14

Dep.") at 79-80, 129-30, 142, 144-45; Ex. E to Robins Cert., Deposition Testimony of
Madanmohan R. Patel, M.D. ("Patel Dep.") at 47-48.)

As for Plaintiff's GI consult, Martin submitted the consult request on July 21, 2008, it
needed to be approved by the medical director or associate state medical director first, and then
once it was approved it would be scheduled. (Defs.' SMF ¶ 78.) Soliman approved the GI
consult on July 22, 2008, and the consult was scheduled to take place on August 13, 2008, in the
New Jersey State Prison. (Id. ¶ 79.)

## II.    PROCEDURAL HISTORY

On April 30, 2010, Plaintiff filed a complaint in the United States District Court for the
Eastern District of New York against NJDOC, The Health Services Unit (the "HSU"), SWSP,
Defendant Martin, and John Does #1-5 (the "original Complaint"). (See generally Doc. No. 1.)
The case was subsequently transferred to the District of New Jersey. (Doc. No. 10.) On October
15, 2010, Plaintiff voluntarily dismissed his claims against NJDOC, the HSU, and SWSP. (Doc.
No. 24.) On November 15, 2010, Defendant Martin answered the original Complaint and
discovery commenced. (Doc. Nos. 25, 29.)

On July 13, 2012, Plaintiff filed a Motion for Leave to Amend his Complaint in order to
add CMS, Meeker, Anicette, and Soliman as Defendants. (Doc. No. 61.) The Court granted
Plaintiff's Motion and Plaintiff filed his Amended Complaint against Defendants on October 5,
2012. Plaintiff's Amended Complaint asserts the following claims against all Defendants: a 42
U.S.C. § 1983 claim for cruel and unusual punishment in violation of the Eighth Amendment
(Count I); a § 1983 claim for retaliation against free expression in violation of the First
Amendment (Count II); a § 1983 entity liability (Monell) claim for cruel and unusual punishment
in violation of the Eight Amendment (Count III). (See Compl. ¶¶ 83-113.)

On September 30, 2013, the Court denied Defendants' Motions to Dismiss. (Doc. No. 95.) After the close of discovery, Defendants filed the present Motion for Summary Judgment with respect to each of Plaintiff's claims. (Doc. No. 113.) Defendants advance several arguments in support of their motion, but Plaintiff has voluntarily withdrawn all claims except his § 1983 claim for cruel and unusual punishment in violation of the Eighth Amendment against Martin. (See Pl.'s Opp'n at 12, 14 (withdrawing "custom or policy" claims, withdrawing all allegations to the extent they rely upon respondeat superior liability, and withdrawing the claim that Defendants violated his First Amendment rights); see also id. at 4-11 (stating opposition to Defendants' Motion only with respect to Martin); cf. Opinion on Defendants' Motions to Dismiss (Doc. No. 94) at 16-19 (construing Plaintiff's claims against Meeker, Anicette, Yasser, and Soliman in their official capacities as claims against CMS, and upholding claims against Meeker, Anicette, Yasser, and Soliman in their individual capacities based on their possible roles as policy- or custom-makers).)[5] As the present Motion has been fully briefed, the Court will proceed to address the parties' arguments.[6]

---

[5] Plaintiff apparently attempts to "reserve the right to reinstate his [custom or policy] claims if [the] deposition of Mr. Meeker shows that CMS did, in fact, have a custom or policy that resulted in deliberate indifference to Plaintiff's serious medical needs." (Pl.'s Opp'n at 12.) However, as Plaintiff is faced with substantive arguments made by Defendants in favor of granting summary judgment on Plaintiff's custom or policy claims against CMS, Meeker, Anicette, Soliman, and Yasser, he cannot circumvent the Court's analysis of his claims and the record evidence by voluntarily withdrawing his claim at this time, with the caveat that he may reinstate the claim at some point when he obtains sufficient evidence. Accordingly, so far as Plaintiff has not actually voluntarily withdrawn his claim or consented to summary judgment, as he does with respect to any respondeat superior liability claims, and his claim that Defendants violated his First Amendment rights, the Court discusses, infra in Part IV.b, the lack of any evidence on the record supporting Plaintiff's § 1983 custom or policy claim for a violation of the Eighth Amendment.

[6] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities." Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)). "This may be done upon motion of a party or the Court." Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")). Here, Plaintiff has failed to amend his Amended

16

## III.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. Anderson, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor. Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. Anderson, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor. Id. at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

Complaint or otherwise identify any of the fictitious defendants despite the fact that discovery has now closed. Thus, these parties shall be dismissed.

17

## IV.    DISCUSSION

### A.    Deliberate Indifference to Serious Medical Needs (Count I)

Section 1983 affords a cause of action for certain violations of an individual's

constitutional rights.  The statute provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983.  In order to state a claim for relief under § 1983, a plaintiff must allege, first,

the violation of a right secured by the Constitution or laws of the United States and, second, that

the alleged deprivation was committed or caused by a person acting under color of state law.  See

West v. Atkins, 487 U.S. 42, 48 (1988); Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011);

Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

Plaintiff alleges that Martin violated his Eighth Amendment rights by "deliberately and

intentionally fail[ing] to provide the necessary treatment for Plaintiff's ulcerative colitis . . .

[d]espite having knowledge of Plaintiff's serious medical needs." (Compl. ¶ 84).  Defendants

argue that Plaintiff has failed to establish that Martin acted with deliberate indifference to

Plaintiff's serious medical need.  Plaintiff disagrees.

Under the Eighth Amendment, a prisoner has a right to be free from cruel and unusual

punishment, which includes deliberate indifference to a prisoner's serious medical needs.  Ham

v. Greer, 269 Fed. App'x 149, 151 (3d Cir. 2008) (citing Estelle v. Gamble, 429 U.S. 97, 104

(1976)).  To properly state a claim for a violation of the Eighth Amendment, Plaintiff must

allege: (1) a serious medical need; and (2) acts or omissions by prison officials that indicate

JA - 000020

deliberate indifference to that need. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

"A medical need is serious if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Maldonado v. Terhune, 28 F. Supp. 2d 284, 289 (D.N.J. 1998) (internal quotation marks omitted). Further if a denial or delay of medical attention "causes an inmate to suffer a life-long handicap or permanent loss", serious medical need may also be found. Id. (quoting Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988). The parties do not dispute that Plaintiff's ulcerative colitis was a serious medical need.

Once a serious medical need has been shown, an inmate then must show that "prison officials acted with deliberate indifference to his serious medical need." Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). Deliberate indifference is manifest "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury' . . . . Similarly, where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." Monmouth Cnty., 834 F.2d at 346 (citations omitted); see also Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) ("When ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of Estelle has been violated.") (citing West v. Keve, 571, F.2d 158, 162 (3d Cir. 1978)). Deliberate indifference may also occur where a prison doctor "insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or

19

entailed substantial risk of serious harm to prisoners." White v. Napolean, 897 F.2d 103, 109 (3d Cir. 1990).

Deliberate indifference rises well above mere malpractice or negligence; "it is a state of mind equivalent to reckless disregard of a known risk of harm." Andrews v. Camden Cty., 95 F. Supp. 2d 217, 228 (D.N.J. 2000). A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. See id.; see also Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White, 897 F.2d at 110; see Christy v. Robinson, 216 F. Supp. 2d 298, 413 (D.N.J. 2002) ("[A] misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference.") "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Fantone v. Herbik, 528 Fed. App'x 123, 125 (3d Cir. 2013) (quoting United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 n.2 (3d Cir. 1979)). Thus, "[c]ourts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." Inmates of Allegheny, 612 F.2d at 762 (internal quotation marks omitted) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see also White, 897 F.2d at 110 ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.") For instance, "the question whether an X-ray or additional diagnostic

techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." Estelle, 429 U.S. at 107.

Generally, even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06; White, 897 F.2d at 110. However, while the test under Estelle "'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients,' such diagnosis and treatment must be sufficiently informed so as not to suggest deliberate indifference on the part of [the defendant]." Hankey v. Wexford Health Sources, Inc., 383 Fed. App'x 165, 170 (3d Cir. 2010) (internal quotation marks omitted) (citing Inmates of Allegheny, 612 F.2d at 762). "Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny, 612 F.2d at 762; see also Goodrich v. Clinton Cnty. Prison, 214 Fed. App'x 105, 114 (3d Cir. 2007) (Pollak, J., dissenting) ("[W]hen an informed judgment has not been made—where, for example, the prison official in question does not have medical training—concerns about second-guessing professional determinations are simply not at issue.")

Defendants argue that Plaintiff has not demonstrated both that Martin, in responding to Plaintiff's medical needs, was objectively indifferent to his serious medical need, and that Martin had actual knowledge that his alleged actions or omissions presented a substantial risk of harm to Plaintiff. (Defs.' Br. at 5.) Further, Defendants argue that any disagreement Plaintiff has regarding the sufficiency of his treatment is insufficient to establish a claim of deliberate indifference. (Id. at 20.) Plaintiff responds by arguing that Martin was deliberately indifferent to Plaintiff's serious medical needs because he knew Plaintiff needed particular treatment and failed

21

to provide that treatment. (Pl.'s Opp'n at 6-10.) Plaintiff relies entirely upon the report of

Turner. According to Turner's medical opinion, Plaintiff needed to receive IV hydration and

medication, Plaintiff's weight loss, worsening dehydration, and tachycardia needed immediate

attention that was not being given, Plaintiff should not have been discharged to general

population, and Martin failed to promptly obtain a GI consult for Plaintiff. The Court finds that

Plaintiff has not submitted sufficient evidence, or shown a dispute as to certain material facts,

from which a jury could conclude that Martin was deliberately indifferent to Plaintiff's serious

medical needs. It is undisputed that Plaintiff received some form of treatment while at SWSP.

Any dispute concerning the adequacy of Plaintiff's treatment sounds in negligence, as Plaintiff

has failed to adduce any evidence tending to show Martin's subjective indifference in making

treatment decisions concerning Plaintiff's care.

First, Plaintiff has not shown that Martin lacked the knowledge, training, or experience to

make an informed medical judgment regarding the planned course of treatment for Plaintiff's

symptoms, or that a specialist with greater knowledge, training, or experience had ordered a

different, exclusive course of treatment that Martin was aware of. See White 897 F.2d at 110

(noting that where the complaint did not allege that a prior doctor ordered treatment with a

particular drug exclusively, or that the prior doctor indicated the plaintiff's treatment would fail

if that was withheld, the plaintiff had failed to state a cause of action against the defendant for his

persistence in using a different drug to treat the plaintiff); Johnston v. Corr. Med. Servs., Inc. No.

05-5235, 2008 WL 5401636, at *7 (D.N.J. Dec. 23, 2008) (denying summary judgment where

the defendant knew a specialist had concluded that a cystectomy (or ileoconduit) was necessary

and the only way to get rid of the plaintiff's fistula; the defendant conceded that he lacked the

knowledge, training, or experience to second-guess the specialists' recommendations; and a fact-

22

finder could have concluded the defendant had "no medically justifiable reason for declining to provide Plaintiff with this [the necessary surgery] and was deliberately indifferent to the consequences of denying such treatment.") Nor has Plaintiff offered evidence suggesting that Martin continued a course of conduct that he knew was painful, ineffective, or entailed a substantial risk of serious harm to Plaintiff. White, 897 F.2d 109.

Defendants do not contest that Martin knew IV hydration would have been ideal, but they note that because an IV could not be placed due to Plaintiff's prior drug use, oral hydration and medication were used. (See Martin Dep. at 168-69.) It was Martin's opinion that oral hydration and medication were sufficient because Plaintiff was not throwing up, he was "stable," and he was able to eat and drink. (Id. at 168:24-169:3 ("[Plaintiff] was eating. [Plaintiff] was drinking. If someone is eating and drinking, there is no need to [use IV hydration]. If they're clinically stable, there is no need to do this; hemostatically stable, there is no need to do it").) Plaintiff's expert clearly has a different opinion regarding the necessity of using IV hydration and medication to treat Plaintiff, but because Plaintiff points to no evidence suggesting Martin could not make an informed decision on the issue, or that Martin's decision was not based on sound medical judgment, the Court will not second-guess that judgment. See Inmates of Allegheny, 612 F.2d at 762. Other than the general conclusion offered by Turner that oral hydration and medication is ineffective for someone in Plaintiff's position, Plaintiff fails to adduce evidence suggesting Martin knew that his decision to administer fluids and medication orally was ineffective or entailed a substantial risk of harm. See White, 897 F.2d 109.

It is undisputed that Martin, and several other SWSP medical personnel, examined Plaintiff multiple times between July 17, 2008, and August 1, 2008, the date of Plaintiff's second discharge from the Infirmary to general population, and noted his various symptoms, including

23

weight, heart rate, stool frequency and consistency, and other subjective complaints. Each time

Plaintiff was transferred back to general population, Martin examined Plaintiff, noted that his

vital signs were "good" and "stable," and determined that because he did not find "anything

acute going on that warranted [Plaintiff] to be in [the Infirmary]," Plaintiff should be discharged.

(See Martin Dep. at 196-97, 240, 247.) When he was discharged on July 21, 2008, Plaintiff

reported that his number of stools had decreased, that he was feeling better, and that he was not

vomiting, and he communicated that he understood the need to take his medication and continue

drinking water and nutritional supplements as much as possible. (See Defs.' SMF ¶¶ 42-45.)

Plaintiff's weight was also at 139 pounds, (id. ¶ 43), the same weight he was at when he was

transferred to SWSP. (See id. ¶ 32.) On August 1, 2008, Martin found that Plaintiff's vital signs

were good, SWSP personnel had not witnessed any bleeding, and Plaintiff was eating and

drinking. (Martin Dep. at 240:5-19; 247:6-11.) Though Plaintiff's weight was at 133 pounds,

(Defs.' SMF ¶ 51), Martin believed it was "stable," and because he could not find anything

"acute going on," Plaintiff was discharged to general population. (Martin Dep. at 240:5-19;

247:6-11.) Whether or not Martin's decision was ultimately incorrect, or even negligent,

Plaintiff does not dispute that Martin was qualified to make such a judgment concerning

Plaintiff's treatment plan, or that Martin did in fact exercise his "professional judgment." See

Inmates of Allegheny, 612 F.2d at 762.

        As far as the need for a GI consult, both parties acknowledge that a consultation was

requested and approved, and Martin's own comments on the GI consult referral form indicate

that he believed Plaintiff needed a GI consult. (See Defs.' SMF ¶ 46; Ex. Q-1 to Robins Decl.,

July 21, 2008, GI Consult Referral Form.) The record indicates that once Martin requested a

consult, it was up to other administrative officials to approve and schedule the necessary consult.

24

JA - 000026

(See Defs.' SMF ¶ 46.) In other words, not only was Martin's decision to request a GI consult the sort of decision the Court generally will not review in the context of an Eight Amendment claim, see Estelle, 429 U.S. at 107, a consult was in fact requested by Martin shortly after Plaintiff's arrival at SWSP, and the determination to approve and schedule the consult was made by other individuals. The record simply does not reflect a denial of a reasonable request for medical treatment, an intentional refusal to provide care, or an act by Martin, or any other SWSP personnel, which prevented Plaintiff from obtaining the care they knew he reasonably needed. See Lanzaro, 834 F.2d at 346; Inmates of Allegheny, 612 F.2d at 762.

What the Court is left with is a genuine dispute over the adequacy of Plaintiff's treatment, but not a dispute over whether Plaintiff was in fact treated by Martin, or whether Martin exercised his informed, professional judgment in making treatment decisions for Plaintiff. This is insufficient to sustain Plaintiff's claim. See Fantone 528 Fed. App'x at 125. Eighth Amendment liability under § 1983 requires "more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986). Here, the record does not indicate that Martin showed "deliberate indifference to [Plaintiff's] serious medical needs." White, 897 F.2d at 109.

Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Count I against Martin.

### B.    Custom or Policy of Deliberate Indifference (Counts I and III)

Plaintiff apparently claims in his Amended Complaint that CMS, Meeker, Anicette, and Soliman had in place a policy or custom that violated his constitutional rights under the Eight Amendment, or were policymakers indifferent to Plaintiff's medical needs.

JA - 000027

To sustain a § 1983 claim, Plaintiff "must provide evidence that there was a relevant ...

policy or custom, and that the policy caused the constitutional violation [he] allege[s]." Natale,

318 F.3d at 584. Defendants argue that Plaintiff has failed to produce any such evidence, and the

record does not reflect any evidence of the creation or implementation of a custom or policy

which has been shown to have resulted in Plaintiff's alleged constitutional violation. Therefore,

the Court will grant Defendants' Motion for Summary Judgment as to Counts I and III against

CMS, Meeker, Anicette, and Soliman.

## V.    CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment will be

**GRANTED**. An appropriate order shall issue today.


Dated:    3/10/2015                              s/ Robert B. Kugler
                                                 ROBERT B. KUGLER
                                                 United States District Judge


26

JA - 000028